## IN RE NEAGLE, Petitioner.[1]

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF CALIFORNIA.

No. 1472. Argued March 4, 5, 1890. — Decided April 14, 1890.

An appeal from the decision of a Circuit Court of the United States in a
*habeas corpus* case, under Rev. Stat. § 764, as amended by the act of
March 3, 1885, 23 Stat. 437, c. 353, brings up the whole case, both law
and facts, and imposes upon this court the duty of reëxamining it, upon
the full record as it was heard in the inferior court.

A person who is in custody for an act done or omitted in pursuance of a
law of the United States, or of an order, process or decree of a court,
or judge thereof, or is in custody in violation of the Constitution, or a
law or treaty of the United States, may, under the provisions of Rev.
Stat. § 753, be brought before any court of the United States, or justice
or judge thereof, by writ of *habeas corpus*, for the purpose of an inquiry
into the cause of his detention; and the court or justice or judge is re-
quired by § 761 to proceed in a summary way to determine the facts of
the case, by hearing the testimony and arguments, and thereupon to dis-
pose of the party as law and justice require.

By virtue of Rev. Stat. §§ 606, 610, the justices of the Supreme Court
of the United States are allotted among the nine circuits, to each one of
which a judge is assigned; and the latter section makes it the duty of
each judge to attend the Circuit Court in each district of the circuit to
which he is allotted, and thereby imposes upon him the necessity of

---

[1] The docket title of this case is "*Thomas Cunningham, Sheriff of the
County of San Joaquin, California, Appellant,* v. *David Neagle.*"

travelling from his residence to the Circuit Court which he is to attend, and from each place in that circuit where the court is held to the other places where it is held. *Held*, that, while a judge is thus travelling to or from those places, he is as much in discharge of his duty as when listening to and deciding cases in open court, and is as much entitled to protection in the one case as in the other.

While there is no express statute authorizing the appointment of a deputy marshal, or any other officer to attend a judge of the Supreme Court when travelling in his circuit, and to protect him against assaults or other injury, the general obligation imposed upon the President of the United States by the Constitution to see that the laws be faithfully executed, and the means placed in his hands, both by the Constitution and the laws of the United States, to enable him to do this, impose upon the Executive department the duty of protecting a justice or judge of any of the courts of the United States, when there is just reason to believe that he will be in personal danger while executing the duties of his office.

An assault upon a judge of a court of the United States, while in discharge of his official duties, is a breach of the peace of the United States, as distinguished from the peace of the State in which the assault takes place.

Under the provisions of Rev. Stat. § 788, it is the duty of marshals and their deputies in each State to exercise, in keeping the peace of the United States, the powers given to the sheriffs of the State for keeping the peace of the State; and a deputy marshal of the United States, specially charged with the duty of protecting and guarding a judge of a court of the United States, has imposed upon him the duty of doing whatever may be necessary for that purpose, even to the taking of human life.

United States officers and other persons, held in custody by state authorities for doing acts which they were authorized or required to do by the Constitution and laws of the United States, are entitled to be released from such imprisonment; and the writ of *habeas corpus* is the appropriate remedy for that purpose.

David Neagle, a deputy marshal of the United States for the District of California, was brought by writ of *habeas corpus* before the Circuit Court of that District, upon the allegation that he was held in imprisonment by the sheriff of San Joaquin County, California, on a charge of the murder of David S. Terry. He alleged that the killing of Terry by him was done in pursuance of his duty as such deputy marshal in defending the life of Mr. Justice Field, while in discharge of his duties as Circuit Judge of the ninth circuit. On the trial of this writ in the Circuit Court it entered an order discharging the prisoner, finding that he was in custody for an act done in pursuance of a law of the United States, and was imprisoned in violation of the Constitution and laws of the United States. The case being brought up to the Supreme Court by appeal, this court, on examining the voluminous testimony, arrived at

the conviction that there was a settled purpose on the part of Terry and his wife, amounting to a conspiracy, to murder Mr. Justice Field, on his official visit to California in the summer of 1889; that this arose from animosity against him on account of judicial decisions made in the Circuit Court of the United States for the Northern District of California in a suit or suits to which they were parties; that the purpose which they had of doing Mr. Justice Field an injury became so well and so publicly known, that a correspondence ensued between the marshal and the District Attorney of that District and the Attorney General of the United States, the result of which was that Neagle was appointed a deputy marshal for the express purpose of guarding Mr. Justice Field against an attack by Terry and his wife which might result in his death; that such an attack did take place; that Neagle, being there for the said purpose of affording protection, had just reason to believe that the attack would result in the death of Mr. Justice Field unless he interfered; and that he did justifiably interfere by shooting Terry while in the act of assaulting Mr. Justice Field, whom he had already struck two or three times. _Held_,

(1) That Neagle was justified in defending Mr. Justice Field in this manner;

(2) That in so doing he acted in discharge of his duty as an officer of the United States;

(3) That having so acted, in that capacity, he could not be guilty of murder under the laws of California, nor held to answer to its courts for an act for which he had the authority of the laws of the United States;

(4) That the judgment of the Circuit Court, discharging him from the custody of the sheriff of San Joaquin County, must therefore be affirmed.

MR. JUSTICE MILLER, on behalf of the court, stated the case as follows:

This was an appeal by Cunningham, sheriff of the county of San Joaquin, in the State of California, from a judgment of the Circuit Court of the United States for the Northern District of California, discharging David Neagle from the custody of said sheriff, who held him a prisoner on a charge of murder.

On the 16th day of August, 1889, there was presented to Judge Sawyer, the Circuit Judge of the United States for the Ninth Circuit, embracing the Northern District of California, a petition signed David Neagle, deputy United States marshal, by A. L. Farrish on his behalf. This petition represented that

the said Farrish was a deputy marshal duly appointed for the Northern District of California by J. C. Franks, who was the marshal of that district. It further alleged that David Neagle was, at the time of the occurrences recited in the petition and at the time of filing it, a duly appointed and acting deputy United States marshal for the same district. It then proceeded to state that said Neagle was imprisoned, confined and restrained of his liberty in the county jail in San Joaquin County, in the State of California, by Thomas Cunningham, sheriff of said county, upon a charge of murder, under a warrant of arrest, a copy of which was annexed to the petition. The warrant was as follows:

" In the Justice's Court of Stockton Township.

" STATE OF CALIFORNIA,
    County of San Joaquin, } ss :

" The People of the State of California to any sheriff, constable, marshal, or policeman of said State or of the county of San Joaquin :

" Information on oath having been this day laid before me by Sarah A. Terry that the crime of murder, a felony, has been committed within said county of San Joaquin on the 14th day of August, A.D. 1889, in this, that one David S. Terry, a human being then and there being, was wilfully, unlawfully, feloniously, and with malice aforethought shot, killed and murdered, and accusing Stephen J. Field and David Neagle thereof : You are therefore commanded forthwith to arrest the above-named Stephen J. Field.[1] and David Neagle and bring them before me, at my office, in the city of Stockton, or, in

---

[1] The Governor of California, on learning that a warrant had been issued for the arrest of Mr. Justice Field, promptly wrote to the Attorney General of the State, urging " the propriety of at once instructing the District Attorney of San Joaquin County to dismiss the unwarranted proceeding against him," as his arrest " would be a burning disgrace to the State unless disavowed." The Attorney General as promptly responded by advising the District Attorney that there was "no evidence to implicate Justice Field in said shooting," and that " public justice demands that the charge against him be dismissed; " which was accordingly done.

case of my absence or inability to act, before the nearest and most accessible magistrate in the county.

"Dated at Stockton this 14th day of August, A.D. 1889.

"H. V. J. SWAIN,
"*Justice of the Peace.*

"The defendant, David Neagle, having been brought before me on this warrant, is committed for examination to the sheriff of San Joaquin County, California.

"Dated August 15, 1889.                    H. V. J. SWAIN,
"*Justice of the Peace.*"

The petition then recited the circumstances of a rencontre between said Neagle and David S. Terry, in which the latter was instantly killed by two shots from a revolver in the hands of the former. The circumstances of this encounter and of what led to it will be considered with more particularity here-after. The main allegation of this petition was that Neagle, as United States deputy marshal, acting under the orders of Marshal Franks, and in pursuance of instructions from the Attorney General of the United States, had, in consequence of an anticipated attempt at violence on the part of Terry against the Honorable Stephen J. Field, a justice of the Supreme Court of the United States, been in attendance upon said justice, and was sitting by his side at a breakfast table when a murderous assault was made by Terry on Judge Field, and in defence of the life of the judge the homicide was committed for which Neagle was held by Cunningham. The allegation was very distinct that Justice Field was engaged in the discharge of his duties as circuit justice of the United States for that circuit, having held court at Los Angeles, one of the places at which the court is by law held, and, having left that court, was on his way to San Francisco for the purpose of holding the Circuit Court at that place. The allegation was also very full that Neagle was directed by Marshal Franks to accompany him for the purpose of protecting him, and that these orders of Franks were given in anticipation of the assault which actually occurred. It was also stated, in more general

terms, that Marshal Neagle, in killing Terry under the circumstances, was in the discharge of his duty as an officer of the United States, and was not, therefore, guilty of a murder, and that his imprisonment under the warrant held by Sheriff Cunningham was in violation of the laws and Constitution of the United States, and that he was in custody for an act done in pursuance of the laws of the United States. This petition being sworn to by Farrish, and presented to Judge Sawyer, he made the following order:

"Let a writ of *habeas corpus* issue in pursuance of the prayer of the within petition, returnable before the United States Circuit Court for the Northern District of California.

"SAWYER, *Circuit Judge.*"

The writ was accordingly issued and delivered to Cunningham, who made the following return:

"COUNTY OF SAN JOAQUIN, *State of California.*

"SHERIFF'S OFFICE.

"To the honorable Circuit Court of the United States for the Northern District of California:

"I hereby certify and return that before the coming to me of the annexed writ of *habeas corpus* the said David Neagle was committed to my custody, and is detained by me by virtue of a warrant issued out of the justice's court of Stockton township, State of California, county of San Joaquin, and by the endorsement made upon said warrant. Copy of said warrant and endorsement is annexed hereto and made a part of this return. Nevertheless, I have the body of the said David Neagle before the honorable court, as I am in the said writ commanded.

"August 17, 1889.                     THOS. CUNNINGHAM,

"*Sheriff San Joaquin County, California.*"

Various pleadings and amended pleadings were made which do not tend much to the elucidation of the matter before us. Cunningham filed a demurrer to the petition for the writ of

*habeas corpus* and Neagle filed a traverse to the return of the sheriff, which was accompanied by exhibits, the substance of which will be hereafter considered when the case comes to be examined upon its facts.

The hearing in the Circuit Court was had before Circuit Judge Sawyer and District Judge Sabin. The sheriff, Cunningham, was represented by G. A. Johnson, Attorney General of the State of California, and other counsel. A large body of testimony, documentary and otherwise, was submitted to the court, on which, after a full consideration of the subject, the court made the following order:

"In the Matter of David Neagle, on *habeas corpus.*

"In the above-entitled matter, the court having heard the testimony introduced on behalf of the petitioner, none having been offered for the respondent, and also the arguments of the counsel for petitioner and respondent, and it appearing to the court that the allegations of the petitioner in his amended answer or traverse to the return of the sheriff of San Joaquin County, respondent herein, are true, and that the prisoner is in custody for an act done in pursuance of a law of the United States, and in custody in violation of the Constitution and laws of the United States, it is therefore ordered that petitioner be, and he is hereby, discharged from custody."

From that order an appeal was allowed which brought the case to this court, accompanied by a voluminous record of all the matters which were before the court on the hearing.

*Mr. Z. Montgomery*, for appellant, argued mainly on the facts, maintaining that they showed that Terry had no purpose of seriously injuring Mr. Justice Field, and that therefore the killing was without excuse. He also presented in his brief the following questions of law:

Section 753 of the Revised Statutes provides "That the writ (of *habeas corpus*) shall not extend to a prisoner in jail . . . unless he is in custody for an act done or committed in pursuance of a law of the United States, or of an order, process, or

decree of a court thereof, or in custody in violation of the Constitution, or of a law or treaty of the United States." If, in killing Terry, Neagle was acting "in pursuance of a law of the United States," and if it appears that he was in custody in violation of the Constitution or a law of the United States, construing the word "law" as the law-making power intended it should be construed, then the writ of *habeas corpus* was properly issued; otherwise not. What, then, is the meaning of the word "law" as used in said section?

The Circuit Court, in rendering the decision now under review, by way of defining the word "law," used this language: "It will be observed that the language of the provision of section 753 is an act done . . . in pursuance of a law of the United States, not in pursuance of a statute of the United States."

The court seems to have assumed that there is such a thing as "a common law" of the United States. But this court has said there is no such thing. "It is clear that there can be no common law of the United States. The federal government is composed of twenty-four sovereign and independent states; each of which may have its local usages, customs and common law. There is no principle which pervades the Union and has the authority of law, that is not embodied in the Constitution or laws of the Union. The common law could be made a part of our federal system only by legislative adoption." *Wheaton* v. *Peters*, 8 Pet. 591, 658.

In the case of *Tennessee* v. *Davis*, 100 U. S. 257, a case strongly relied upon by the Circuit Court as a sustaining authority for its decision in this case, the Supreme Court, in determining what is meant by the words "laws of the United States," as employed in the second section of the third article of the Federal Constitution, said: "Cases arising under the laws of the United States are such as grow out of the legislation of Congress, whether they constitute the right or privilege or claim or protection, or defence of the party, in whole or in part, by whom they are asserted." p. 264.

This, it will be observed, is a judicial construction by our highest court placed upon the words "laws of the United

States," as used in that very article of the Federal Constitu-: tion, which was intended to fix a limit beyond which Congress itself could not go in conferring jurisdiction upon a United States court. So that if we construe the words, "law of the United States," found in section 753 of the Revised Statutes, as including other laws than those enacted by Congress, we give to them a meaning which, in the light of the decision just quoted, would render them unconstitutional. In all the cases cited as authority by the Circuit Court, where an act of an officer of the United States was held to have been "done or committed in pursuance of a law of the United States," the "law" relied upon as authorizing such act was a statute.

In order to grasp the true spirit and intention of section 753, in authorizing federal courts to release, on *habeas corpus*, persons "in custody for acts done or omitted in pursuance of a law of the United States," etc., it may be well to recur to the evil intended to be remedied by the act as originally passed in 1833, and afterwards incorporated in section 753. In *Ex parte Jenkins*, 2 Wall. Jr. 521, a case cited by the Circuit Court in deciding this case, Mr. Justice Grier, referring to the act in question, said: "This act was passed when a certain State of this Union had threatened to nullify acts of Congress and to treat those as criminals who should attempt to execute them, and it was intended as a remedy against such state legislation." p. 529.

A careful examination of the cases cited wherein the federal courts have discharged on *habeas corpus* persons held in custody "for acts done or omitted in pursuance of a law of the United States," will show not only that the acts so done or omitted were in pursuance of a plain statutory law of the United States, but that such statutory law had been repudiated and sought to be nullified either by state legislation, or by state judicial tribunals without the aid of such state legislation. In other words, they were cases wherein persons had been arrested and imprisoned because of acts done or omitted in obedience to statutory laws of the United States, which statutory laws certain state tribunals had refused to recognize as laws. If it be contended that the slaying of Terry

by Neagle was, in fact, an act of justifiable homicide, done pursuant to a law of the United States, and Neagle's arrest and imprisonment even to await trial for said homicide constituted an illegal restraint of his liberty, which made it the duty of the federal court to release him on *habeas corpus*, as provided by § 753, I answer that such a contention is refuted, not only by the authorities cited, but by the express language of this court in *Ex parte Royall*, 117 U. S. 241, 247.

So, likewise, if the California statute which defines the crime of murder, the crime with which Neagle stands charged, was repugnant to the Constitution or laws of the United States, or if the facts which under the laws of California constitute murder, would under the laws of the United States be justifiable homicide, then it might be truthfully said that the State's "prosecution against Neagle had nothing upon which to rest, and the entire proceeding against him is a nullity."

But it is not pretended that there is any repugnance between the state law defining the crime with which Neagle is charged, and the Constitution or statutes of the United States. Hence I repeat there is no legal pretext for the interposition of a federal court in order to prevent his conviction and punishment for an act " done in pursuance of a law of the United States."

Thus it seems clear that, even if Neagle in the killing of Terry, had in fact been acting in pursuance of a law of the United States, still, unless there was something in the laws of California as construed by her courts that would make such a homicide punishable, he could not be lawfully released under § 753 merely because he was being held in custody to await his trial in a state court in order to have it determined judicially whether the homicide had, or had not, been committed in pursuance of a law of the United States.

While we concede that, under the laws of California, Neagle or anybody else would have had a right to protect Mr. Justice Field against a felonious assault, even by taking the life of the assailant, if necessary, we deny that the marshal had any authority under the statutes of the United States to send him on such a mission, or that the fact that he was a deputy mar-

shal conferred any special power upon him. Such a power, if it exists, must be found in § 787 or § 788 of the Revised Statutes. Section 787 makes it "the duty of the marshal of each district to attend the District and Circuit Courts when sitting therein, and to execute" precepts. This does not authorize the marshal to attend the judges of the court, wherever they may go : and such seems to have been the interpretation put upon the act by the District Attorney, when he wrote to the Attorney General on the 7th of May : "And while due caution has always been taken by the marshal, when either Judge or Mrs. Terry is about the building in which the courts are held, he has not felt it within his authority to guard either Judge Sawyer or Justice Field against harm when away from the appraisers' building."

In this construction of the law it seems to me that the marshal was clearly right. But he now seeks, and his deputy, Neagle, seeks, and the decision under review seeks to justify the marshal, in sending a body guard to attend Mr. Justice Field when away from the court, and away from the appraisers' building, by reason and under authority of instructions from the United States Attorney General. My first answer to this plea is, that neither the Attorney General, nor the President acting through the Attorney General, was empowered by law to give to Marshal Franks any such authority as would justify him in sending Deputy Marshal Neagle for any such purpose. And my second answer is, that there is nothing in the record to show that either the Attorney General, or the President through the Attorney General, ever gave or attempted to give to Marshal Franks any order, direction or instruction, which even purports to authorize the sending of a deputy marshal on any such errand as that referred to.

If the President has any such power as he is claimed to have exercised in this instance, where does he get it? If the President has power, within the jurisdiction of the several States, to keep a body guard for every instrument of the federal government, he has power to place a marshal in the house of every American citizen in order to shield him from harm at the hands of his fellow-citizens. And, if it has come

to this, what use, would I ask, have we for state governments?

*Mr. Attorney General* for the appellee.

Neagle's right to a writ of *habeas corpus* is an inheritance from the common law, guaranteed by the Constitution, Art. 1, cl. 2, § 9.

Under section 751 of the Revised Statutes, authorizing the Circuit Court to issue writs of *habeas corpus*, the petitioner being restrained of his liberty, as he claims, in violation of the Constitution and laws of the United States, was entitled to demand, upon filing a proper petition, that a writ issue as a writ of right, and that the court determine whether he was thus unlawfully restrained of his liberty. Section 753 does not attempt to limit the right of the court to issue the writ in any case covered by the Constitution; that is, in any case arising under the Constitution or laws of the United States. It does, by a process of exclusion and definition, make more clear some of the cases to which the federal jurisdiction extends.

The question, then, is whether the imprisonment, from which the petitioner sought to be relieved by this writ, was an imprisonment arising under the Constitution of the United States, and the laws made in pursuance thereof; for any question arising under valid laws arises under the Constitution. A prisoner in custody for an act done or omitted, in pursuance of a law of the United States, or of an order, process, or decree of the court or judge thereof, is in custody in violation of the Constitution of the United States.

But whether the right to the writ rests on the Constitution or statute, or both, the question is whether the petitioner, Neagle, arrested by the officer of the State of California for taking the life of David S. Terry, in defence of the life of Mr. Justice Field, was in custody in violation of the Constitution and laws of the United States. I shall not stop to argue the question whether Neagle acted in good faith and with sufficient reason for supposing the life of Justice

Field was in danger. I am content to leave that question upon the statement of facts, and the conclusion on the facts as set forth in the opinion of the Circuit Court.

I. It was the duty of the Executive Department of the United States to guard and protect, at any hazard, the life of Mr. Justice Field in the discharge of his duty : (1) Because such protection is essential to the existence of the government; (2) Because it is enjoined upon the President, as the executive, he being required "to take care that the laws be faithfully executed ;" (3) The marshal was merely the hand of the executive, and unless protected by the marshal the courts and judges have no protection.

The reason why I say it is the duty of the Executive Department to protect the judicial, and why I say it has the authority so to do, is because the power of self-preservation is essential to the very existence of the government.

In the thirtieth number of the Federalist, written by Hamilton, I find this : "A government ought to contain in itself every power requisite to the full accomplishment of the objects committed to its care, and the complete execution of the trusts for which it is responsible, free from every control but a regard to the public good and the sense of the people."

In the fifty-eighth number of the same work, written by the same author, [these numbers are taken from Dawson's [1] edition,] I find this, speaking of the power given in the Constitution to the general government to regulate the election of senators and representatives : "Its propriety rests upon the evidence of this plain proposition, that every government ought to contain in itself the means of its own preservation."

---

[1] In the editions of the Federalist prior to 1863, these two papers are respectively numbered 31 and 59. In that year Mr. Dawson's edition appeared, as the result of a collation of the first edition with the original articles in the newspapers. In his edition the title was changed from " Federalist" to " Fœderalist;" the name of one of the writers, (Mr. Jay,) was changed from " Jay " to " Jáy;" and the numbering of the papers after No. 28 was so altered that No. 31 of all previous editions became No. 30, and No. 59 became No. 58. The expediency of changing a numeration accepted by Hamilton, Jay and Madison, and adopted by the latter in the Hallowell editions, may be questioned.

Not less forcibly, by another distinguished gentleman, who honors us this morning by his presence, as a listener, is the same principle stated. Mr. Bayard, late Secretary of State, soon after this difficulty occurred, wrote as follows: "The robust and essential principle must be recognized and proclaimed, that the inherent powers of every government which is sufficient to authorize and enforce the judgments of its courts are equally and at all times and in all places sufficient to protect the individual judge who fearlessly and conscientiously in the discharge of his duty pronounces judgment."

This court has more than once announced the same doctrine. See *Cohens* v. *Virginia*, 6 Wheat. 264, 384, 387, 388 ; *Martin* v. *Hunter*, 1 Wheat. 304, 363 ; *Ex parte Siebold*, 100 U. S. 371 ; *Tennessee* v. *Davis*, 100 U. S. 257 ; *Ex parte Yarbrough*, 110 U. S. 651.

Argument certainly cannot be necessary to show the duty of the Executive Department of the government of the United States to protect the courts and judges in the discharge of their duties. Indeed, it is hardly supposed that this will be questioned. The President, as the head of the Executive Department, is under the constitutional obligation "to take care that the laws be faithfully executed." To the end that he may in every contingency discharge this duty, he is made Commander-in-Chief of the army and navy, and of the militia of the several States when called into active service.

No one questions the right or duty of the President to furnish guards for the mail or an escort for a paymaster carrying government treasure wherever danger is apprehended. Are the persons of the United States judges, travelling from place to place in the performance of their duties less sacred? less entitled to government protection than mail-bags or packages of money? Nor is the protection of the person more properly a matter of local concern than the protection of property. The person of a United States officer, in the discharge of his duty, is always clothed with the United States sovereignty, and in that sovereignty should be his protection.

The Constitution provides that before the President enters upon the execution of his office he shall take an oath: " I do

solemnly swear that I will faithfully execute the office of President of the United States and will to the best of my ability preserve, protect and defend the Constitution of the United States."

Standing, on the 4th of March, 1861, upon the steps of this Capitol, confronted by the mightiest rebellion the world ever saw, President Lincoln said to his dissatisfied countrymen: "You have no oath registered in heaven to destroy the government, while I shall have the most solemn one to preserve, protect and defend it."

He evidently supposed that this oath, embodied in the Constitution, was of some significance; and that being required to take this oath he was invested with some power adequate to the obligation. He understood that to preserve, protect and defend the Constitution meant to preserve, protect and defend the government; and that it was his right and his duty, independently or in the absence of acts of Congress, to use all the power placed at his disposal for the protection and preservation of the government. I observe that neither one of the arguments filed on behalf of the appellant refers to this clause of the Constitution at all. Has it, therefore, no significance? Does it not by necessary implication invest the President with self-executing powers; that is, powers independent of statute? Is it true that after the inauguration of President Washington and before Congress had passed any laws the President had no authority, so far as he had the means, to protect the property of the United States? It is certain that he was without any such authority if the arguments for the appellant, that he can act only in pursuance of specific acts of Congress, are sound.

We insist that, by the Constitution of the United States, a government was created possessed of all the powers necessary to existence as an independent nation; that these powers were distributed in three great constitutional departments, and that each of these departments is, by that Constitution, invested with all of those governmental powers, naturally belonging to such department, which have not been expressly withheld by the terms of the Constitution. In other words, that Congress

is invested not only with expressed but with implied legislative powers; that the judiciary is invested not only with expressed powers granted in the Constitution as its share of the government, but with all the judicial powers which have not been expressly withheld from it; and that the President, in like manner, by the very fact that he is made the chief executive of the nation, and is charged to protect, preserve, and defend the Constitution, and to take care that the laws are faithfully executed, is invested with necessary and implied executive powers which neither of the other branches of the government can either take away or abridge; that many of these powers, pertaining to each branch of the government, are self-executing, and in no way dependent, except as to the ways and means, upon legislation.

If it be said that in the Constitution or statutes no specific direction to the President, the Attorney General, or the marshal can be found to protect the judges from assault or assassination, the answer is plain. This argument is an assumption that the doctrine of necessary and implied powers, which has been so often sustained in support of statutes, is confined to the legislative branch of the government, and that the executive has no powers except those expressly granted in the Constitution. On the contrary, when, by the Constitution, the President is invested with the executive power of the nation, and when that instrument enjoins upon him that he shall "take care that the laws be faithfully executed," it confers upon him all power reasonably incident to the exercise of the executive function, and necessary to the vindication and enforcement of the laws, which has not been withheld from him by the Constitution; and the power so granted in the Constitution Congress neither has nor has claimed to have, the right to abrogate. See *Ex parte Siebold, ubi sup.,* at pp. 395, 396; and *Ex parte Yarbrough, ubi sup.*

It must not be forgotten that, if the courts and judges cannot be protected by the executive through marshals, they cannot be protected at all. They are powerless to protect themselves. The executive is armed, not only with the power of the marshals and the civil posse, but with all the military and

naval forces of the government. Congress holds the purse, and is in condition not only to assert and defend its own rights, but to coerce the just consideration of its wishes at all times and on all subjects; while the judiciary is strong only in the respect and reverence of the people.

II. It was the duty of the judiciary, having been thus protected by the Executive Department, to sit in judgment upon, and to vindicate the officer of the Executive Department, if innocent, in the discharge of his duty : (1) because such authority in the federal judiciary is essential in principle to the existence of the nation; (2) such authority is amply sustained by decisions of this court.

Such authority in the federal judiciary is essential in principle to the existence of the nation. It rests on the axiom already cited that every government must have within itself the resources for its own protection and preservation. It is argued that this homicide may be a crime against the State, and therefore the question should be adjudicated by a state tribunal. But this is a begging of the whole question. If Neagle simply did his duty as an officer of the United States he could not have done a wrong to the State of California; for an act cannot, at the same time, be a duty to the general government and a crime against the State. The fallacy of this argument lies in the assumption that here are two coördinate sovereignties, and that the citizen owes equal allegiance to both. On the contrary, as has been decided in this court, as often as the question has ever arisen, in all matters within the sphere of the general government, that government and the obligations it imposes are supreme, and where any supposed right or claim of a State contravenes such obligation, it must yield. *Cohens* v. *Virginia, ubi sup.,* at page 385 ; *Ableman* v. *Booth,* 21 How. 506, 517, 518.

The assumption of the right in the state court to try a federal officer for an act done in the discharge of his official duty implies the precedent right to arrest and the subsequent right to convict and punish such officer, and each involves consequences utterly inconsistent with the dignity and security of an independent government. The right to arrest the mar-

hal for this act after its performance implies the right to forbid and prevent its performance. Such a right is inconsistent with the dignity and supremacy of the general government. I do not claim that because a man is a federal officer he is not subject to arrest and trial in the state courts. I only claim that, for his official acts as such federal officer, he cannot be called in question in the state courts. In short, that the functions and agencies of the federal government cannot be interrupted or interfered with by state authority. *McCulloch* v. *Maryland*, 4 Wheat. 316, 431; *Weston* v. *Charleston*, 2 Pet. 449; *Collector* v. *Day*, 11 Wall. 113.

Section 643 of the Revised Statutes, providing for the issuance of writs of *habeas corpus cum causa*, and the removal from state to federal courts of prosecutions instituted against revenue officers and officers acting under registration laws, and providing for the trial of such cases in the federal courts, is a clear assertion of this power; and this law has been upheld in this court. *Tennessee* v. *Davis*, 100 U. S. 257. The same assertion of authority is found in the *Enrolment Act*, 13 Stat. 8, c. 13, § 12; *United States* v. *Gleason*, 1 Wool. C. C. 75; *United States* v. *Gleason*, 1 Wool. C. C. 128.

III. The right of a state court to hear and determine whether a federal officer has properly discharged his duty, according to the federal law, must stand or fall upon its own merit, and in no way depends upon the question whether the federal government has provided the formalities for a jury trial of that question. The jurisdiction of the state court in the premises, like the title of a plaintiff in ejectment, must stand or fall by itself.

Nor is there such force in the objection that the case is disposed of before a single judge, without a jury trial, as might at first be supposed. Nothing is more common than for cases of homicide to be disposed of simply by preliminary examination before a justice of the peace, or United States commissioner, or an examination before a coroner's jury, or upon an *ex parte* examination before a grand jury. The truth is, the guaranty of the right of trial by jury is for the benefit of the accused, not of the government. Moreover, the law makes no-

distinction between trials for homicide and other felonies and misdemeanors, as to the right of a jury trial. If the jurisdiction of the federal court to hear and discharge a prisoner is to be denied in every case in which, according to the course of the common law, a jury trial would follow an indictment in a state court, then the authority of the federal courts to protect their officers against prosecution for fidelity to duty in a state court would be practically destroyed; for a jury trial is guaranteed in every criminal prosecution. But, however this may be, it is sufficient that it is the law that, either in the first or last instance, upon *habeas corpus*, or upon appeal or error, the federal courts have the right, and it is their bounden duty, to sit in judgment upon the official conduct of a federal officer.

IV. The only remaining question is whether the Circuit Court for the Northern District of California had the right to discharge the petitioner upon *habeas corpus* in the first instance, or whether the matter should have been allowed to proceed in the state court, subject to the right of this court to review the action of the state court upon a writ of error.

"When the petitioner is in custody by state authority for an act done or omitted to be done, in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof, . . . . in such and like cases of urgency involving the authority and operation of the general government, or the obligations of this country to, or its relations with, foreign nations, the courts of the United States have frequently interposed by writs of *habeas corpus* and discharged prisoners who were held in custody under state authority." *Ex parte Royall*, 117 U. S. 241, 251. See, also, *Wildenhus's Case*, 120 U. S. 1; *Botiller v. Dominguez*, 130 U. S. 238; *Ex parte Bridges*, 2 Woods, 428; *Ex parte McCardle*, 6 Wall. 318, 325; *Tennessee v. Davis*, 100 U. S. 257.

Numerous cases involving the right of the United States courts to discharge by *habeas corpus* persons from the custody of the officers of the state courts, on a charge of murder, have been decided at circuit, all supporting the jurisdiction of the United States courts in the premises. *Ex parte Jenkins*, 2 Wall. Jr. 521, decided by Mr. Justice Grier; *Ex parte Robin-*

*son,* 6 McLean, 355, decided by Mr. Justice McLean; *Roberts v. The Jailor of Fayette County,* 2 Abb. (U. S.) 265; *In re Ramsey,* 2 Flipp. 451; *In re Neill,* 8 Blatchford, 156, 167; *In re Farrand,* 1 Abb. (U. S.) 149; *Electoral College of South Carolina,* 1 Hughes, 571; *In re Hurst,* 2 Flipp. 510, are all cases involving the same principle and decided in the same way; but as these cases are all cited and discussed in the opinion of the Circuit Court in this case, I merely refer to them.

V. The writ of *habeas corpus* in this case was a writ of right. The petitioner being in custody, by reason of an act done in the discharge of his duty to the federal government, had the absolute right to its protection and to be heard and discharged at once. The case, within the decisions of this court, was a case of "urgency," and the Circuit Court had no discretion in the premises.

*Mr. Joseph H. Choate* (with whom was *Mr. James C. Carter* on the brief) for appellee.

I. There is no merit or force in any of the technical points raised by the Bill of Exceptions.

II. The true function and office of the writ of *habeas corpus* provided by the several statutes, amendatory of section 14 of the Judiciary Act of 1789, and now embodied in section 753 of the Revised Statutes, is not confined to what it was at common law, but necessarily devolves the power upon the federal court or judge, in inquiring into the cause of restraint of liberty, to hear and determine the facts and the law which constitute the petitioner's case of justification, by federal authority, of the act done, or of a violation, by his continued custody, of the federal Constitution, law or treaty, or of privilege, etc., by the law of nations, and to discharge the petitioner from custody, if such is made out, and to remand him if not.

The 14th section of the Judiciary Act, 1 Stat. 82, limited the power of federal judges to grant the writ, in the case of prisoners in jail, to cases where they were "in custody under or by color of the authority of the United States, or are com-

mitted to trial before some court of the same, or are necessary to be brought into court to testify."

How far, under that statute, the federal courts could go behind the return, considering that it gave them the power to grant the writ for the express "purpose of an inquiry into the cause of restraint of liberty," probably never was, and need not now be determined.

Certainly, as the English law then stood, that is, the common law and the Habeas Corpus Act of Charles II., the judges and courts in England confined themselves very closely to what appeared upon the face of the return, where it had been legal and regular, and the process had been issued by a court of competent jurisdiction. But the writ of *habeas corpus* seems always to have had a more extended use in the United States than in England, and inquiries under it have been more varied and far-reaching here than in that country. Church on Habeas Corpus, § 221, p. 272.

The act of March 2, 1833, 4 Stat. 632, c. 57, besides providing, by its third section, for the removal at any time before trial, from the state court into the Circuit Court, of any suit or prosecution for any act done under the *revenue* laws of the United States, or for any right, authority or title set up or claimed by such officer under any such law, by its seventh section conferred upon federal judges, in addition to the authority already conferred by law, power to grant writs of *habeas corpus* in all cases of a prisoner or prisoners in jail or confinement, " where he or they shall be committed or confined on, or by any authority or law, for any act done, or omitted to be done, in pursuance of a law of the United States, or any order, process or decree of any judge or court thereof."

This act, like that of 1789, contained no provisions regulating the practice and procedure after the return; but, in view of the national crisis which led to the passage of the act, it can hardly be doubted that the intent of Congress, by this seventh section, was to enable the federal judge, if, upon the proofs, he found the fact to be that the petitioner was in custody for an act done in pursuance of a law of the United States, to discharge him; and, to ascertain that fact, he must

of necessity resort to any evidence that might be offered material to determine it.

The act of August 29, 1842, however, with the debates that preceded its passage, and the emergency out of which it arose, sheds the clearest light upon the function and the purpose of the *habeas corpus* provisions, as they were finally carried into the revision.

At the time of the passage of that act the executive and judiciary of the State of New York, in the case of McLeod, charged with murder in the state court, had successfully refused and resisted the intervention of the federal government, attempted upon the ground that, by the law of nations, the act of McLeod, which was charged to have resulted in the homicide, was an act done under the authority of the British nation, and therefore did not subject him individually to trial and punishment therefor by the municipal law of the State where the homicide was committed; and that, as the Constitution of the United States committed the whole subject of foreign intercourse to the federal government, the British subject, so charged with crime, ought, upon the demand of the federal government, to be released from the custody of the state court.

But, as the statutes stood, the federal judges had no power to issue a writ of *habeas corpus* in such a case; and it was to give them that power, and to provide in what cases they should exercise it, that the act of 1842, 5 Stat. 539, c. 257, entitled "*An Act to provide further remedial justice in the courts of the United States,*" was passed.

Here clearly was an unmistakable assertion of the supremacy of the judicial power of the national government over the States and state courts, to the full extent of withdrawing from the state court the prisoner charged with alleged crime, and there awaiting trial by jury, and providing for the summary trial by the federal judge without a jury, on proofs to be taken before him, of the one federal question raised in the cause, with full power and discretion in the federal judge to discharge him, if he made out his claim of foreign sovereign authority, and prohibiting the States from ever again trying

or touching him for that alleged offence. It is to be noted, too, that the question must, in the nature of the case, be determined by the federal judge, not upon a mere inspection of any statute, order or commission, but necessarily upon a complete exploration of all the facts, just as they would in natural course have been laid before the jury in the state court, if the case had there proceeded. To this extent, and for the determination of this single question, it was the clear intent of Congress to override and supersede the jurisdiction of the state court.

An examination of the debates in the Senate which preceded this enactment will demonstrate this position.

The next piece of legislation was the act of February 5, 1867, 14 Stat. 385, c. 28, which again enlarged the power of the federal judges to issue writs of *habeas corpus*, so as to include all cases of restraint of liberty in violation of the Constitution or of a law or treaty of the United States; and here again the procedure is regulated so as to secure a full and final trial upon evidence, before the federal judge without a jury, of the one single federal question arising in the case as the ground for discharge from custody, and enabling and requiring the federal judge to explore all the facts bearing on that one question as fully as a jury would have done, if it had been left to proceed in the state court. Upon the return of the writ, a day is to be set for "the hearing of the cause." The petitioner may deny any material facts set forth in the return, and may allege any facts to show that the detention is in contravention of the Constitution or laws of the United States. The pleadings on either side may be amended so that the material facts may be ascertained — and it is provided that the "said court or judge shall proceed in a summary way to determine the facts of the case by hearing testimony and the arguments of the parties interested, and if it shall appear that the prisoner is deprived of his or her liberty in contravention of the Constitution or laws of the United States he or she shall forthwith be discharged and set at liberty." p. 386. The act concludes with the same provision, staying all proceedings on the same charge, pending proceedings on appeal,

and after final judgment of discharge, as was contained in the act of 1842.

Upon the face of this act, certainly, it is impossible to put any other construction than that the one federal question is withdrawn from the state court for final decision by the circuit judge without a jury, and that the prisoner must be discharged, if that question be decided in his favor, and that, too, whether there is any provision already made by Congress for trying him or not. It was clearly intended to preclude all further trial, if, and only if, the federal question was decided in his favor, except that the decision of the circuit judge was to be reviewed in this court.

Meantime came the case of *Ex parte Jenkins*, 2 Wall. Jr. 521, 526, and the Fugitive Slave Law Cases.

In this condition of the statutes and the decisions, the revision of the statute was made in 1874, Rev. Stat. c. 13, §§ 751–766, "Habeas Corpus."

It cannot be doubted that the effect of the revision is, and was intended to be, to make the procedure and the power and duty of the judge issuing the writ uniform and the same in all the cases covered by the several successive acts, and now embodied in § 753; to withdraw the federal question, on which the petitioner claims justification and exemption, away from the state court for full and final determination by the federal judge without a jury; and to discharge him from the custody of the state court, when he establishes, by proof to the satisfaction of the federal judge, that he is entitled to his discharge, but if he fails to make out such right, then to remand him to the state court's custody.

No other meaning than this can be imputed to the words in § 761: "and thereupon to dispose of the party as law and justice may require" in view of the explicit duty to discharge contained in the Acts of 1842 and 1867, which were being condensed and revised, and of the obvious intent to subject all cases alike to the same regulation.

Under this statutory scheme of *habeas corpus*, it is wholly immaterial whether there is any provision by federal criminal law conferring jurisdiction upon any court over the prisoner

when discharged. Congress has by this very act made what it deemed to be suitable provision for the case by substituting for a trial by jury, under federal authority, of the one question of justification, a trial by a judge without a jury, and by the Supreme Court on appeal. If he makes out such justification before that tribunal, the necessary theory of the act is that he is to be deemed innocent; that he has committed no crime; that he has only done what the supreme law of the country has required him to do. If, however, he fails to make out his alleged justification under federal authority, then he is remanded for trial on the charge made in the state court.

It is certainly too late at this day to question or discuss the power of Congress to provide, by means of this scheme of *habeas corpus* procedure for the removal from the state court into the federal court, for examination and determination, of this single question of federal authority, or of custody in violation of the federal Constitution and laws, when it arises in any case, civil or criminal, in a state court.

This exercise of power under the Constitution is far within that which was conceded to Congress by this court in *Tennessee* v. *Davis*, 100 U. S. 257.

In truth the alarm which is suggested at the idea of its being entrusted to a federal court, consisting of two judges, to try, subject to a review in this court, the question of federal authority and consequent immunity, as being a possible mode of escape for a party possibly guilty of murder, without any trial, is based upon no foundation.

The single question is to be fully tried, not upon affidavits, but upon testimony — not *ex parte*, but after a full hearing of both sides. And the power entrusted to the federal court over this one question is not so great as the same power over the whole case, which is entrusted to the ordinary committing magistrate, or to the judge on the trial, on the motion to quash, or on a motion in arrest of judgment after verdict. It is, in legal apprehension, the same power which is given to this court, upon the single federal question, on writ of error.

No case appears to have arisen under section 7 of this act for twenty years after its passage. When the execution of the

obnoxious Fugitive Slave law exposed the marshals to violent opposition and attack in the discharge of the duties imposed upon them by Congress, and to arrest, indictment and trial in the state courts on charges of assault or murder, for acts necessarily done by them in the performance of such duties, they immediately appealed to the federal courts for the protection afforded by this section seven, and the Circuit Courts have uniformly used it for the efficient protection and relief of all federal officers so charged and in custody, and this, as we submit, with the implied assent of Congress and the express approval of this court. The result of this line of decisions is so cogent, in support of the action of the court below in this case, as to command careful attention here. See *Ex parte Jenkins*, 2 Wall. Jr. 521 (1853); *Ex parte Robinson*, 6 McLean, 355; *Ex parte Robinson*, 4 Am. Law Reg. 617; *In re McDonald*, 9 Am. Law Reg. 661; *United States ex rel. Roberts* v. *Jailor of Fayette County*, 2 Abbott (U. S.) 265.

In this state of the adjudications under the seventh section of the Act of 1833, Congress revised the en're series of statutes in regard to *habeas corpus* in the manner already pointed out. It must be deemed to have known and approved the settled construction which the federal courts, for more than twenty years, had given to the Act of 1833; and when it incorporated in section 753 the cases covered by that act with the cases covered by the Judiciary Act and the Acts of 1842 and 1867, and enjoined upon the Circuit Courts, in all the cases alike, the duty to make a full and exhaustive inquiry into the facts, and to hear the cause and render final judgment of discharge, if law and justice so required, it must be deemed to have intended to sanction and confirm the exercise of the jurisdiction which the federal courts, under the more limited scope of the Act of 1833, had habitually asserted. *McDonald* v. *Hovey*, 110 U. S. 629; *Duramus* v. *Harrison*, 26 Alabama, 326; Sedgwick on Construction of Stat. (2d ed.) 229, note, and cases cited.

After the revision, other cases occurred, where the Circuit Courts released upon *habeas corpus* parties held in custody by the state courts for alleged crimes against the State. *Ex parte*

*Bridges*, 2 Woods, 428; *Ramsey* v. *The Jailor*, 2 Flipp. 457; *In re Brosnahan*, 18 Fed. Rep. 62. These must have been the cases to which this court referred in *Ex parte Royall*, 117 U. S. 241, 251, when it said that in "cases of urgency involving the authority and operations of the general government, or the obligations of this country to, or its relations with, foreign nations, the courts of the United States have frequently interposed by writs of *habeas corpus* and discharged prisoners who were held in custody under state authority."

III. The personal protection of Mr. Justice Field by Neagle was a duty imposed upon him by authority of the United States, and the homicide necessarily committed by him in rendering that protection effectual was "an act done by him in pursuance of a law of the United States," in the sense of the statute; and his detention therefor by the state court on a charge of murder was "in violation of the Constitution and laws of the United States" in the sense of the statute.

It is not pretended that there is any single specific statute making it his duty to furnish this protection. The authority arose directly and necessarily out of the Constitution and positive congressional enactments. Whatever is necessarily implied is as much a part of the Constitution and statutes as if it were actually expressed therein.

The corporate government established by the Constitution is a nation, absolutely sovereign over every foot of soil and over every person within the national territory and within the sphere of action assigned to it. Within that sphere, its Constitution and laws are the supreme law of the land, and its proper instrumentalities of government can be subjected to no restraint, and can be held to no accountability by any other power whatsoever.

It has, necessarily, the inherent power of protecting itself and its agents in the exercise of all its constitutional powers, and of executing its own laws by its own tribunals, without any interruption from a State or any state authorities.

The government of the United States and the government of a State are distinct and independent of each other, within their respective spheres of action, although existing and exercising their powers within the same territorial limits.

Neither government can intrude within the jurisdiction of the other, or authorize any interference therein, by its judicial officers, with the action of the other. But whenever any conflict arises between the enactments of the two sovereignties, or in the enforcement of their asserted authorities, those of the national government have supremacy, until the validity of the different enactments and authorities is determined by the tribunals of the United States.

In such case, the surrender to a state court of the right to determine the existence of its sovereignty is the surrender of sovereignty itself. *Martin* v. *Hunter's Lessee*, 1 Wheat. 304 (1816); *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819); *Cohens* v. *Virginia*, 6 Wheat. 264 (1821); *Ableman* v. *Booth*, 21 How. 506 (1858); *Ex parte Siebold*, 100 U. S. 371 (1879); *Tennessee* v. *Davis*, 100 U. S. 257 (1879).

Such absolute and perfect protection being thus guaranteed to them by the Constitution, this at least must necessarily follow : that if, when attacked in the discharge of their duties, they protect themselves, or are protected by others, whose aid in the emergency they require, such protection is not merely self-defence authorized by the law of nature or the common law, but is an act clearly authorized by, and done in pursuance of, the Constitution, which enjoins them to proceed against all obstacles in the discharge of their duties.

But for the letter of the law, as it is so stoutly insisted that we must have "*a law*" to authorize the protection of the judge: Article III., Section 1, of the Constitution, declares that " the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish ; " and the second section proceeds to define the cases to which this judicial power shall extend, and as Jay, C. J., says, in *Chisholm* v. *Georgia*, 2 Dall. 475, this shows the precise sense and latitude in which the words " to establish justice," as used in the preamble, are to be understood.

To carry into practical operation the provisions of the Constitution, " to establish justice," and bring it home to the people. Congress has divided the United States into judicial

districts, Rev. Stat. § 530; two of which are in the State of California, Rev. Stat. § 531; Act of August 5, 1886, 24 Stat. 308, c. 928. Circuit Courts are required by law to be held in these districts, Rev. Stat. § 609; and Mr. Justice Field was required by law to be present at them at least once in two years, Rev. Stat. § 610. In obedience to these laws, he was, at the time and place of the attack, travelling from one California circuit, where he had been holding court, to the other, where he was about to hold it. He was, therefore, at the time and place of the attack, *in the direct and immediate discharge of his official duties, — just as much so as if he had been sitting in court in San Francisco.*

Nothing can be clearer than that, if Mr. Justice Field himself had taken the life of Terry necessarily in the defence of his own, in the maintenance and protection of his right and duty to proceed upon his circuit and administer justice at San Francisco, the Constitution and the laws already cited imposing that duty upon him would have brought his case, beyond all question, within section 753 of the Revised Statutes. Neagle's act does so on the same principle and for the same reasons.

IV. But to Neagle's right and duty, as a bystander and citizen, to protect Mr. Justice Field, is to be added his official authority and duty conferred and imposed upon him by acts of Congress as a United States deputy marshal, attending the Justice on his circuit, within the district of which he was marshal. Thus, acting under federal authority and in pursuance of the statutes under which he was appointed, his act in protection of the Justice was clearly within the category of section 753 of the Revised Statutes, " done in pursuance of a law of the United States."

Conceding that marshals must look to the acts of Congress for their powers, these are ample to cover the above proposition. See Rev. Stat. §§ 787, 788. The latter section confers upon them the powers given to sheriffs and deputy sheriffs by state laws. The California code conferred upon sheriffs and their deputies the usual powers to preserve the peace, suppress riots, etc. The Supreme Court of the State has also held that

where the code is silent the common law governs. One of the common-law duties of a sheriff and his deputies was to accompany the judges on circuit and to protect them by an armed force. 1 Macaulay's History, 223 ; Dalton's Office of Sheriffs, London, 1698, c. 98.

These statutes certainly constituted Neagle a peace officer, to keep the peace of the United States when it was broken by the attack on Mr. Justice Field. That, under such circumstances or similar ones, there is such a thing as " the peace of the United States," and that the marshal and his deputies are the proper arm of the federal government to maintain it, seems to have been definitely settled by this court in *Siebold's . Case, ut supra.*

V. But, if more be needed to demonstrate that Neagle, in protecting Mr. Justice Field, was discharging a duty imposed upon him by federal authority, or, in other words, was acting in pursuance of a law of the United States, it is to be found in the order of the Attorney General, which is conclusively presumed to have been the order of the President, commanding the performance of that duty.

We live under a government of laws and not of men, and can claim no authority or power for the President, or for any executive department, not conferred by law. What we assert is, that it is not only within the lawful power, but is the plain duty of the President, when informed that the due and regular administration of justice, on one of the federal circuits, is about to be interfered with by a threatened attack on the federal judge, assigned by law to administer it, and actually engaged in that service, to provide, by adequate means, for his protection. *Little* v. *Barreme,* 2 Cranch, 170 ; *McElrath* v. *United States,* 102 U. S. 426 ; *Runkle* v. *United States,* 122 U. S. 543, 557 ; *United States* v. *Macdaniel,* 7 Pet. 1, 14 ; *Decatur* v. *Paulding,* 14 Pet. 497 ; 6 Opinions Attys. Gen. 341, 342, 346 ; 1 Opinions Attys. Gen. 475 ; *Confiscation Cases,* 20 Wall. 92, 108 ; *United States* v. *San Jacinto Tin Co.,* 125 U. S. 273, 279, 284 ; *Wells* v. *Nickles,* 104 U. S. 444.

VI. The court below did not err in holding that Neagle used no more force than was necessary in protecting Mr.

Justice Field, and that he was therefore entitled to his discharge from custody "for an act done under a law of the United States."

VII. The clearly ascertained fact of the case, that the petitioner was in custody of a state court for an act done in pursuance of a law of the United States, and that he was still an officer of the United States, under obligation to proceed day by day with the discharge of his official duties, shows clearly that he was "in custody in violation of the Constitution of the United States," as provided by the other clause of section 753 of the Revised Statutes, and equally entitled to his immediate discharge on that ground, in the discretion of the Circuit Court, just as much as Mr. Justice Field himself was entitled to be.

*Mr. G. A. Johnson,* Attorney General of the State of California, for appellant.

Section 754 of the Revised Statutes says that application for the writ of *habeas corpus* shall be made by complaint in writing, signed by the person for whose relief it is intended, and that the facts set forth in the complaint shall be verified by the oath of the person making the application. The application for this writ was not signed by the relator, nor sworn to by him. The petitioner is A. L. Farrish, and not David Neagle, and the petition is sworn to by Farrish.

The amended traverse to the return was filed after the evidence was heard, and should have been stricken out. The testimony and proofs should have been stricken out, being introduced before the completion of the issues, but motions for these purposes were denied.

Respondent below then filed a demurrer to the amended traverse, but the court decided the whole case without first passing on the demurrer.

So much for the technical objections. As to the main question, we concede in the outset that in accordance with § 753, Rev. Stat. the writ of *habeas corpus* may extend to a prisoner in jail, if he is in custody for an act done or omitted in pursu-

ance of a law of the United States, or of an order, process or decree of a court or judge thereof, or is in custody in violation of the Constitution or of a law or treaty of the United States. But what we maintain is that the word "law," as mentioned in Section 753, means statutory law and its necessary incidents.

We propose now to call the court's attention to the authorities cited by Judges Sawyer and Sabin, in their opinion in the court below, discharging the relator, and will endeavor to see whether they sustain their conclusion. The great question involved is as to the proper boundary lines between national and state jurisdiction. The judges say: "We simply determine whether it (the homicide) was an act performed in pursuance of a law of the United States. Nor do we act in this matter because we have the slightest doubt as to the authority of the state courts, and their ability and disposition to, ultimately, do exact justice to the prisoner. We have not the slightest doubt or apprehension on that particular, but there is a principle involved."

In the foregoing we agree with them entirely, and we are all desirous that the principle shall be definitely and permanently settled.

The first case cited is *Ex parte Royall*, 117 U. S. 241, 249. This case illustrates how careful federal courts are, in exercising a discretionary power, to interfere with process issued under state laws; that it is not only a matter of comity, but "it is a principle of right and of law, and, therefore, of necessity"; and it is a duty to conciliate rather than alienate and dissever the federal and state tribunals, "so that they may coöperate as harmonious members" of one judicial system.

This machinery of a federal government and of state governments is at once delicate and complex, and consists of balances and adjustments for all time to come, so that there may be no friction; like the harmony of our solar system, where each planet moves in its own orbit, without any impingement by the greater orbit which lightens all.

*Ex parte Royall* has no application to the case at bar, for in that case there was a constitutional question involved,

whether or not the constitutional provision against impairing the obligation of a contract was violated by the act of the General Assembly of Virginia; while the opinion of Judges Sawyer and Sabin does not claim that the statute of California against murder is unconstitutional, or that such a statute does not properly appertain to the police power of the State; so the case of *Ex parte Royall* and the case at bar are not parallel. Nor does the opinion claim, as we understand it, that any specific provision of the constitution of the United States has been infringed by the arrest and detention of the relator.

The next case cited is *Ex parte Siebold*, 100 U. S. 371, 392. This case, and the other cases where indictments had been found, involved the question of the constitutionality of certain sections of Title 26 of the Revised Statutes, entitled "The Elective Franchise," to wit: Sections 2011, 2012, 2016, 2017, 2021, 2022; and also §§ 5515, and 5522, under the title "Crimes." These sections relate to elections of members of the House of Representatives, and were an assertion on the part of Congress of a power to pass laws for regulating and superintending said elections. The question involved was the constitutional power of Congress to make such regulations, and this court sustained such power. In that case there was an act of Congress against obstructing the supervisors of elections and the marshals, and giving them power to keep the peace. In the case at bar there is no act of Congress, as we contend, nor, if we understand the opinion of the court below, is it contended that there is an act of Congress giving jurisdiction to the federal court of this case of alleged murder.

The next case cited by Judge Sawyer is that of *Tennessee* v. *Davis*, 100 U. S. 257. But that case and this are entirely different. That case was removed from the state court into the federal court because of an express act of Congress bearing on the subject (Section 643, Rev. Stat.). The case was transferred to the Circuit Court under the provisions of the foregoing act. A motion was made in the Circuit Court by the Attorney General to remand the case to the state court, on the ground that the federal court had no jurisdiction.

The case went up to the Supreme Court on a certificate of division of opinion between the judges, and yet even in such a case as that, where there was an express act of Congress, two of the judges dissented, Mr. Justice Clifford and Mr. Justice Field.

The majority in their opinion say: "A case consists of the right of one party as well as the other, and may truly be said to arise under the Constitution or a law or a treaty of the United States whenever its correct decision depends upon the const. uction of either. Cases arising under the laws of the United States are such as grow out of the legislation of Congress, whether they constitute the right or privilege, or claim, or protection, or defence of the party, in whole or in part, by whom they are asserted." p. 264. Here there is no statute of the United States which expressly or by necessary implication gave any authority for the relator to commit the homicide in question, so that his act could become a matter of federal cognizance.

The next case cited by the judges in their opinion is that of *Ex parte Jenkins et al.*, 2 Wall. Jr. 521. That case can have no significance here on this inquiry. That was a case, where, as is said, Jenkins and other deputy United States marshals were arrested on the warrant of a justice of the peace in Pennsylvania for shooting and wounding a negro, who resisted an arrest attempted by them under a warrant issued by the United States Court for a fugitive slave, in which case the justice of the United States Circuit Court took jurisdiction, and discharged them on a writ of *habeas corpus*. But in this case there was a law of the United States, to wit: the Fugitive Slave Law of 1850, and a writ had been issued to the marshal by a United States judge under that law; hence, Mr. Justice Grier well says: "In conclusion, as we find that the prisoners are officers of the United States, in confinement for acts done in pursuance of a law of the United States, and under a process from a judge of the same, . . . therefore, the order of the court is, that the prisoner be discharged."

The next case referred to in the opinion we are reviewing is *Ex parte Robinson*, 6 McLean, 355. A petition and affi-

davit of Hiram H. Robinson, marshal of the United States, stated that he was imprisoned under the order of the Honorable Judge Parker, one of the judges of the court of common pleas for the county of Hamilton, for the performance of his duty as marshal, under process signed by a commissioner of the United States, and prayed for a writ of *habeas corpus.* He was discharged by Judge McLean, because what he did was authorized by the Fugitive Slave Act of 1850.

The next case cited in the opinion of Judges Sawyer and Sabin is *United States ex rel. Roberts* v. *Jailor of Fayette County*, 2 Abb. (U. S.) 265, 279. This is a case where a deputy marshal was assisted by Roberts in endeavoring to serve process upon one Call, who was charged with crimes under the internal revenue laws, and who was killed by Roberts. Says the judge: "I disclaim all right and power to discharge the relator on any such ground as that the proof shows he acted in self-defence. A jury would probably acquit him on such ground, independent of the process under which he acted, but I have nothing to do with such an inquiry. It belongs only to the state court. I have only to inquire whether what he did was done in pursuance of a law and process of the United States, and so *justified, not excused,* by that law and process."

The next case cited in the opinion of the lower court is *In re Ramsey*, 2 Flippin, 451. The prisoner, while in the discharge of his duty as deputy United States marshal, killed one Joseph Lightfoot. For that he was arrested and held by the state officers. The officer had in his possession a warrant for the arrest of Lightfoot at the time of the homicide; Lightfoot had declared that he would not submit to an arrest; had reason to know that the officer came there to arrest him, and had a warrant; and his conduct was such as to imperil the life of the officer. Judge Ballard discharged the marshal.

The next case cited is *In re Neill*, 8 Blatchford, 167, which involved certain statutes, whereby the power of discharging from service in the army of the United States minors under the age of eighteen years is taken away from the courts, and is confided wholly to the Secretary of War. The petitioner, General Neill, refused to produce the body of an enlisted sol-

dier before a state judge, and was discharged by Mr. Justice Blatchford, on the basis of these statutes and the statutes in relation to the writ of *habeas corpus.*.

The next case cited is *In re Farrand,* 1 Abb. (U. S.) 140, where a commander in the army of the United States made return to a writ of *habeas corpus* issued by a state court, showing that he held the petitioner as a recruit in the army, and pursuant to laws of the United States regulating enlistments. The state court directed the recruit to be discharged. The officer refused to discharge him, and was committed for contempt. Judge Ballard, on *habeas corpus,* discharged him.

The next case cited is *Electoral College of South Carolina,* 1 Hughes, 571. The conclusion of Judge Bond's opinion will sufficiently explain the case. He says: " That the state board of canvassers were clothed, under the law, with discretionary powers, which required them to discriminate the votes ; to determine and certify the candidates elected after scrutiny, and that they were a part of the executive department of the government, and were in nowise subject to the control, as to what they should do after they had commenced to perform that duty, of the judicial department, and that as this was a general election, at which members of Congress were to be elected, and electors of President and Vice-President of the United States to be chosen, they were acting in official capacity ; or in other words, *in pursuance of a law of the United States;* and, therefore, if any one disturbs them in the exercise of their functions, they are entitled to the protection of the courts of the United States."

. Thus it will be seen that in all these cases cited by Judges Sawyer and Sabin some provision of the Constitution of the United States was violated, or some statute of the United States, or some order or process of a judge or court of the. United States, and for this reason the petitioner was discharged from arrest.

In fact, that court is confronted with a formidable array of authorities and opinions in opposition to its view. *United States* v. *Guiteau,* 1 Mackey, 498, 538 ; *Ex parte Crouch,* 112 U. S. 179 ; the dissenting opinions of Mr. Justice Clifford and

Mr. Justice Field in *Tennessee* v. *Davis, ubi supra;* in *Ex parte Virginia*, 100 U. S. 349; and *Virginia* v. *Rives*, 100 U. S. 336; although we admit, as claimed, that the necessary incidents and implications of the statutes of Congress are as much a part of the law as their express provisions; for the Constitution itself confers on Congress the authority to pass all laws necessary and proper to carry into execution the powers expressly granted.   (Art. 1, sec. 8, Clause 18.)

There is here no act of Congress, as in the act incorporating the United States Bank, *Osborn* v. *Bank of the United States*, 9 Wheat. 865; no act of Congress, as in the case of *Tennessee* v. *Davis*, to wit: Section 643, Revised Statutes; no process issued by a United States commissioner commanding the arrest of some one charged with certain crimes under the internal revenue laws, as in the case of *United States ex rel.* *Roberts* v. *Jailor of Fayette County*, and in the case of *Ableman* v. *Booth*, 21 How. 507; no showing that the party seeking his enlargement was duly mustered into the military service of the United States, and was detained by its officer as such soldier, as in *Tarble's Case*, 13 Wall. 397; and no process from a Circuit Court or judge, as in the case of *Ex parte Jenkins et al.* ·

We respectfully submit, therefore, whether or not the law as laid down by the lower court is not a new departure from established precedents and well adjudicated cases.   Any other position would seem to be alarming in its character, and obliterative of the terminal bounds between federal and state jurisdiction.   It would recognize a vast body of officers, and constantly increasing, as owing no allegiance except to the federal courts, and possessed of special privileges and immunities not conferred by any act of Congress.

We need not particularize, as such a holding would include the whole service of the United States, — Mint, Post Office, Customs, Land Department, Sub-Treasury, Internal Revenue.

Even if it be conceded that Congress has the right to legislate on this subject, and make such a case as the one at bar a case arising under the laws of the United States, it is sufficient to say that Congress has not done so, and there is no other

repository of federal legislative power than the Congress. The general government itself is but a government of limited powers, though supreme within those limits. The great residuum of our liberties exists in the States and the people thereof; they consist in inherent powers and are self-derived, not the outcome of a concession which they have made in the grant to the United States.

Our position is fully covered by the case of *Ex parte Yarbrough*, 110 U. S. 651, 659, where the court says : "It is very true that while Congress at an early day passed criminal laws to punish piracy with death, and for punishing all ordinary offences against person and property committed within the District of Columbia, and in forts, arsenals, and other places within the exclusive jurisdiction of the United States, *it was slow to pass laws protecting officers of the government from personal injuries inflicted while in discharge of their official duties within the States. This was not for want of power, but because no occasion had arisen which required such legislation, the remedies in the state courts for personal violence having proved sufficient.*

"Perhaps the earliest attempts of Congress to protect government officers, while in the exercise of their duty in a hostile community, grew out of the nullification ordinance of South Carolina, and is found in the act further to provide for the collection of duties on imports. . . . When, early in the late civil war, the enforcement of the acts of Congress for obtaining soldiers by draft brought the officers engaged in it into hostile neighborhoods, it was found necessary to pass laws for their protection. Accordingly, in 1863, an act was passed making it a criminal offence to assault or obstruct any officer while engaged in making the draft or in any service in relation thereto." 12 Stat. 731. See also *Ex parte Merryman*, Taney's Dec. 246 ; *Kendall* v. *United States*, 12 Pet. 527, 611 ; *Tracy* v. *Swartwout*, 10 Pet. 80, 94 ; *Gelston* v. *Hoyt*, 3 Wheat. 246, 331.

It is claimed also by the court below that there is a common law which may be appealed to in this case, which contention we have answered by saying that he is confronted with

statutes on the subject matter. But is there any common law for the United States as applicable to this case? Of course, common law terms are to receive a common law signification, such as murder or any other offence at common law, where it is not otherwise defined by act of Congress, or such as *habeas corpus*, or trial by jury.

In the case of *State of Pennsylvania* v. *The Wheeling, etc., Bridge Company et al.*, 13 How. 518, 563, the court says: "It is said that there is no common law of the Union on which the procedure can be founded; that the common law of Virginia is subject to its legislative action, and that the bridge, having been constructed under its authority, it can in no sense be considered a nuisance: that whatever shall be done within the limits of a State is subject to its laws, written or unwritten, unless it be a violation of the Constitution, or of some act of Congress. It is admitted that the federal courts have no jurisdiction of common law offences, and that there is no abstract pervading principle of the common law of the Union under which we can take jurisdiction." See also *Wheaton* v. *Peters*, 8 Pet. 591, 658; *Ex parte Bollman*, 4 Cranch, 75, 93.

We cannot close our argument in this case without bringing up the subject of the police power, which is an inherent power with the States, which they cannot surrender or abdicate, and which cannot be taken away, although Congress may establish police regulations also; but their operation must be confined to the subjects over which it is given control by the Constitution of the United States. The whole domain of the criminal law comes under this power; and the common law maxim, "*Sic utere tuo ut non alienum lœdas*," seems to express in a few words its extensive application. Whatever concerns the public order, the public morals, the public health, the public security and safety, and the right of any and every person to enjoy these immunities, comes under the general police power of the State. The offences which Congress has the right to define and punish are only offences against the authority of the United States. It cannot assume any supervision of the police regulations of the States. All this is elementary learning.

There is a police regulation of the State of California defining the crime of murder and affixing the punishment, when committed within the territory of the State.

This is a matter of mere internal regulation, which can be best looked after and provided for in local districts, and to make it an exclusively national question or a concurrent one with the States would lead to constant attrition, inharmony, conflicts, and embroilments between the States and the national government, which it was the express design of the Constitution to prevent.

The Constitution was formed to make a more perfect union, establish justice, insure domestic tranquillity, and promote the general welfare. Hence, the judicial power of the United States is confined to cases arising under the Constitution of the United States, the laws of the United States, and treaties made, or which shall be made, under their authority, and to some special cases and controversies which have no bearing on the pending question.

As to the extent of the police powers, we cite *Bartemeyer* v. *Iowa,* 18 Wall. 129; *Mugler* v. *Kansas,* 123 U. S. 623, 657; *Powell* v. *Pennsylvania,* 127 U. S. 678; *Barbier* v. *Connolly,* 113 U. S. 27.

*Mr. Samuel Shellabarger* and *Mr. Jeremiah M. Wilson,* for appellant, submitted on their brief.

Mr. Justice Miller, after stating the case as above, delivered the opinion of the court.

If it be true, as stated in the order of the court discharging the prisoner, that he was held " in custody for an act done in pursuance of a law of the United States, and in custody in violation of the Constitution and laws of the United States," there does not seem to be any doubt that, under the statute on that subject, he was properly discharged by the Circuit Court.

Section 753 o' the Revised Statutes reads as follows:

" The writ of *habeas corpus* shall in no case extend to a prisoner in jail, unless where he is in custody under or by color

of the authority of the United States; or is committed for trial before some court thereof; or is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof; or is in custody in violation of the Constitution or of a law or treaty of the United States; or, being a subject or citizen of a foreign State, and domiciled therein, is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, or order, or sanction of any foreign State, or under color thereof, the validity and effect whereof depend upon the law of nations; or unless it is necessary to bring the prisoner into court to testify."

And section 761 declares that when by the writ of *habeas corpus* the petitioner is brought up for a hearing the "court or justice or judge shall proceed in a summary way to determine the facts of the case, by hearing the testimony and arguments, and thereupon to dispose of the party as law and justice require." This of course means that if he is held in custody in violation of the Constitution or a law of the United States, or for an act done or omitted in pursuance of a law of the United States, he must be discharged.

By the law, as it existed at the time of the enactment of the Revised Statutes, an appeal could be taken to the Circuit Court from any court of justice or judge inferior to the Circuit Court in a certain class of *habeas corpus* cases. But there was no appeal to the Supreme Court in any case except where the prisoner was the subject or citizen of a foreign State, and was committed or confined under the authority or law of the United States or of any State, on account of any act done or omitted to be done under the commission or authority of a foreign State, the validity of which depended upon the law of nations. But afterwards, by the act of Congress of March 3, 1885, 23 Stat. 437, this was extended by amendment as follows:

"That section seven hundred and sixty-four of the Revised Statutes be amended so that the same shall read as follows: 'From the final decision of such Circuit Court an appeal may be taken to the Supreme Court in the cases described in the preceding section.'"

The preceding section here referred to is section 763, and is the one on which the prisoner relies for his discharge from custody in this case.

It will be observed that in both the provisions of the Revised Statutes and of this latter act of Congress the mode of review, whether by the Circuit Court of the judgment of an inferior court or justice or judge, or by this court of the judgment of a Circuit Court, the word "appeal," and not "writ of error," is used, and as Congress has always used these words with a clear understanding of what is meant by them, namely, that by a writ of error only questions of law are brought up for review, as in actions at common law, while by an appeal, except when specially provided otherwise, the entire case on both law and facts is to be reconsidered, there seems to be little doubt that, so far as it is essential to a proper decision of this case, the appeal requires us to examine into the evidence brought to sustain or defeat the right of the petitioner to his discharge.

The history of the incidents which led to the tragic event of the killing of Terry by the prisoner Neagle had its origin in a suit brought by William Sharon of Nevada, in the Circuit Court of the United States for the District of California, against Sarah Althea Hill, alleged to be a citizen of California, for the purpose of obtaining a decree adjudging a certain instrument in writing, possessed and exhibited by her, purporting to be a declaration of marriage between them, under the code of California, to be a forgery, and to have it set aside and annulled. This suit, which was commenced October 3, 1883, was finally heard before Judge Sawyer, the Circuit Judge for that circuit, and Judge Deady, United States District Judge for Oregon, who had been duly appointed to assist in holding the Circuit Court for the District of California. The hearing was on September 29, 1885, and on the 15th of January, 1886, a decree was rendered granting the prayer of the bill. In that decree it was declared that the instrument purporting to be a declaration of marriage, set out and described in the bill of complaint, " was not signed or executed at any time by William Sharon, the complainant; that it is not

genuine; that it is false, counterfeited, fabricated, forged, and fraudulent, and, as such, is utterly null and void. And it is further ordered and decreed that the respondent, Sarah Althea Hill, deliver up and deposit with the clerk of the court said instrument, to be endorsed '·cancelled,' and that the clerk write across it 'cancelled' and sign his name and affix his seal thereto."

The rendition of this decree was accompanied by two opinions, the principal one being written by Judge Deady and a concurring one by Judge Sawyer. They were very full in their statement of the fraud and forgery practised by Miss Hill, and stated that it was also accompanied by perjury. And inasmuch as Mr. Sharon had died between the hearing of the argument of the case on the 29th of September, 1885, and the time of rendering this decision, January 15, 1886, an order was made setting forth that fact, and declaring that the decree was entered as of the date of the hearing, *nunc pro tunc*.

Nothing was done under this decree. The defendant, Sarah Althea Hill, did not deliver up the instrument to the clerk to be cancelled, but she continued to insist upon its use in the state court. Under these circumstances, Frederick W. Sharon, as the executor of the will of his father, William Sharon, filed in the Circuit Court for the Northern District of California, on March 12, 1888, a bill of revivor, stating the circumstances of the decree, the death of his father, and that the decree had not been performed; alleging also the intermarriage of Miss Hill with David S. Terry, of the city of Stockton in California, and making the said Terry and wife parties to this bill of revivor. The defendants both demurred and answered, resisting the prayer of the plaintiff, and denying that the petitioner was entitled to any relief.

This case was argued in the Circuit Court before Field, Circuit Justice, Sawyer, Circuit Judge, and Sabin, District Judge. While the matter was held under advisement, Judge Sawyer, on returning from Los Angeles, in the Southern District of California, where he had been holding court, found himself on the train as it left Fresno, which is understood to.

have been the residence of Terry and wife, in a car in which he noticed that Mr. and Mrs. Terry were in a section behind him, on the same side. On this trip from Fresno to San Francisco, Mrs. Terry grossly insulted Judge Sawyer, and had her husband change seats so as to sit directly in front of the Judge, while she passed him with insolent remarks, and pulled his hair with a vicious jerk, and then, in an excited manner, taking her seat by her husband's side, said: "I will give him a taste of what he will get by and by. Let him render this decision if he dares," — the decision being the one already mentioned, then under advisement. Terry then made some remark about too many witnesses being in the car, adding that "The best thing to do with him would be to take him out into the bay and drown him." These incidents were witnessed by two gentlemen who knew all the parties, and whose testimony is found in the record before us.

This was August 14, 1888. On the 3d of September, the court rendered its decision granting the prayer of the bill of revivor in the name of Frederick W. Sharon and against Sarah Althea Terry and her husband, David S. Terry. The opinion was delivered by Mr. Justice Field, and during its delivery a scene of great violence occurred in the court-room. It appears that shortly before the court opened on that day, both the defendants in the case came into the court-room, and took seats within the bar at the table next the clerk's desk, and almost immediately in front of the judges. Besides Mr. Justice Field there were present on the bench Judge Sawyer, and Judge Sabin of the District Court of the United States for the District of Nevada. The defendants had denied the jurisdiction of the court originally to render the decree sought to be revived, and the opinion of the court necessarily discussed this question without reaching the merits of the controversy. When allusion was made to this question Mrs. Terry rose from her seat, and addressing the justice who was delivering the opinion, asked in an excited manner whether he was going to order her to give up the marriage contract to be cancelled. Mr. Justice Field said: "Be seated, madam." She repeated the question, and was again told to be seated. She then said,

in a very excited and violent manner, that Justice Field had
been bought, and wanted to know the price he had sold himself
for ; that he had got Newland's money for it, and everybody
knew that he had got it, or words to that effect. Mr. Justice
Field then directed the marshal to remove her from the court-
room. She asserted that she would not go from the room, and
that no one could take her from it.

Marshal Franks proceeded to carry out the order of the
court by attempting to compel her to leave, when Terry, her
husband, rose from his seat under great excitement, exclaim-
ing that no man living should touch his wife, and struck the
marshal a blow in his face so violent as to knock out a tooth.
He then unbuttoned his coat, thrust his hand under his vest,
apparently for the purpose of drawing a bowie-knife, when
he was seized by persons present and forced down on his back.
In the meantime Mrs. Terry was removed from the court-
room by the marshal, and Terry was allowed to rise and was
accompanied by officers to the door leading to the marshal's
office. As he was about leaving the room, or immediately
after being out of it, he succeeded in drawing a bowie-knife,
when his arms were seized by a deputy marshal and others
present to prevent him from using it, and they were able to
wrench it from him only after a severe struggle. The most
prominent person engaged in wresting the knife from Terry
was Neagle, the prisoner now in court.

For this conduct both Terry and his wife were sentenced by
the court to imprisonment for contempt, Mrs. Terry for one
month and Terry for six months, and these sentences were
immediately carried into effect. Both the judgment of the
court on the petition for the revival of the decree in the case
of Sharon against Hill and the judgment of the Circuit Court
imprisoning Terry and wife for contempt have been brought
to this court for review, and in both cases the judgments have
been affirmed. The report of the cases may be found in *Ex
parte Terry*, 128 U. S. 289, and *Terry* v. *Sharon*, 131 U. S. 40.

Terry and Mrs. Terry were separately indicted by the grand
jury of the Circuit Court of the United States during the same
term for their part in these transactions, and the cases were

pending in said court at the time of Terry's death. It also appears that Mrs. Terry, during her part of this altercation in the court-room, was making efforts to open a small satchel which she had with her, but through her excitement she failed. This satchel, which was taken from her, was found to have in it a revolving pistol.

From that time until his death the denunciations by Terry and his wife of Mr. Justice Field were open, frequent, and of the most vindictive and malevolent character. While being transported from San Francisco to Alameda, where they were imprisoned, Mrs. Terry repeated a number of times that she would kill both Judge Field and Judge Sawyer. Terry, who was present, said nothing to restrain her, but added that *he* was not through with Judge Field yet; and, while in jail at Alameda, Terry said that after he got out of jail he would horsewhip Judge Field; and that he did not believe he would ever return to California, but this earth was not large enough to keep him from finding Judge Field and horsewhipping him; and, in reply to a remark that this would be a dangerous thing to do, and that Judge Field would resent it, he said: "If Judge Field resents it I will kill him." And while in jail Mrs. Terry exhibited to a witness Terry's knife, at which he laughed, and said, "Yes, I always carry that," and made a remark about judges and marshals, that "they were all a lot of cowardly curs," and he would "see some of them in their graves yet." Mrs. Terry also said that she expected to kill Judge Field some day.

Perhaps the clearest expression of Terry's feelings and intentions in the matter was in a conversation with Mr. Thomas T. Williams, editor of one of the daily newspapers of California. This interview was brought about by a message from Terry requesting Williams to call and see him. In speaking of the occurrences in the court, he said that Justice Field had put a lie in the record about him, and when he met Field he would have to take that back, "and if he did not take it back and apologize for having lied about him, he would slap his face or pull his nose." "I said to him," said the witness, "'Judge Terry, would not that be a dangerous thing to do?

Justice Field is not a man who would permit any one to put a deadly insult upon him like that.' He said, ' Oh, Field won't fight.' I said, 'Well, Judge, I have found nearly all men will fight; nearly every man will fight when there is occasion for it, and Judge Field has had a character in this State of having the courage of his convictions, and being a brave man.' At the conclusion of that branch of the conversation, I said to him, ' Well, Judge Field is not your physical equal, and if any trouble should occur he would be very likely to use a weapon.' He said, ' Well, that's as good a thing as I want to get.' The whole impression conveyed to me by this conversation was, that he felt he had some cause of grievance against Judge Field; that he hoped they might meet, that he might have an opportunity to force a quarrel upon him, and he would get him into a fight." Mr. Williams says that after the return of Justice Field to California in the spring or summer of 1889, he had other conversations with Terry, in which the same vindictive feelings of hatred were manifested and expressed by him.

It is useless to go over the testimony on this subject more particularly. It is sufficient to say that the evidence is abundant that both Terry and wife contemplated some attack upon Judge Field during his official visit to California in the summer of 1889, which they intended should result in his death. Many of these matters were published in the newspapers, and the press of California was filled with the conjectures of a probable attack by Terry on Justice Field, as soon as it became known that he was going to attend the Circuit Court in that year.

So much impressed were the friends of Judge Field, and of public justice, both in California and in Washington, with the fear that he would fall a sacrifice to the resentment of Terry and his wife, that application was made to the Attorney General of the United States suggesting the propriety of his furnishing some protection to the judge while in California. This resulted in a correspondence between the Attorney General of the United States, the District Attorney, and the marshal of the Northern District of California on that subject. This correspondence is here set out:

"DEPARTMENT OF JUSTICE,
"WASHINGTON, *April 27th*, 1889.

"JOHN C. FRANKS, United States Marshal, San Francisco, Cal.

"SIR: The proceedings which have heretofore been had in connection with the case of Mr. and Mrs. Terry in your United States Circuit Court have become matter of public notoriety, and I deem it my duty to call your attention to the propriety of exercising unusual caution, in case further proceedings shall be had in that case, for the protection of his Honor Justice Field or whoever may be called upon to hear and determine the matter. Of course, I do not know what may be the feelings or purpose of Mr. and Mrs. Terry in the premises, but many things which have happened indicate that violence on their part is not impossible. It is due to the dignity and independence of the court and the character of its judge that no effort on the part of the government shall be spared to make them feel entirely safe and free from anxiety in the discharge of their high duties.

"You will understand, of course, that this letter is not for the public, but to put you upon your guard. It will be proper for you to show it to the district attorney, if deemed best.

"Yours truly,                 W. H. H. MILLER.
                                    "*Attorney General.*"


"UNITED STATES MARSHAL'S OFFICE,
"NORTHERN DISTRICT OF CALIFORNIA,
"SAN FRANCISCO, *May* 6, 1889.

"Hon. W. H. H. MILLER, Attorney General, Washington, D. C.

"SIR: Yours of the 27th ultimo, at hand.

"When the Hon. Judge Lorenzo Sawyer, our Circuit Judge, returned from Los Angeles (some time before the celebrated court scene) and informed me of the disgraceful action of Mrs. Terry towards him on the cars, while her husband sat in front smilingly approving it, I resolved to watch the Terrys (and so notified my deputies) whenever they should enter the court-room, and be ready to suppress the very first indignity offered, by either of them to the judges. After this, at the time of their ejectment from the court-room, when I held Judge Terry

and his wife as prisoners in my private office and heard his threats against Justice Field, I was more fully determined than ever to throw around the Justice and Judge Sawyer every safeguard I could.

"I have given the matter careful consideration, with the determination to fully protect the federal judges at this time, trusting that the department will reimburse me for any reasonable expenditure.

"I have always, whenever there is any likelihood of either Judge or Mrs. Terry appearing in court, had a force of deputies with myself on hand to watch their every action. You can rest assured that when Justice Field arrives, he, as well as all the federal judges, will be protected from insults, and where an order is made it will be executed without fear as to consequences. I shall follow your instructions and act with more than usual caution. I have already consulted with the United States attorney, J. T. Carey, Esq., as to the advisability of making application to you, at the time the Terrys are tried upon criminal charges, for me to select two or more detectives to assist in the case, and also assist me in protecting Justice Field while in my district. I wish the judges to feel secure, and for this purpose will see to it that their every wish is promptly obeyed. I notice your remarks in regard to the publicity of your letter, and will obey your request. I shall only be too happy to receive any suggestions from you at any time.

"The opinion among the better class of citizens here is very bitter against the Terrys, though, of course, they have their friends, and, unfortunately, among that class it is necessary to watch.

"Your most obedient servant, J. C. FRANKS,
"*U. S. Marshal Northern Dist. of Cal.*"


"SAN FRANCISCO, CAL., *May* 7, 1889.
"Hon. W. H. H. MILLER,
"U. S. Attorney General, Washington, D. C..
"DEAR SIR: Marshal Franks exhibited to me your letter bearing date the 27th ult., addressed to him upon the subject

)f. using due caution by way of protecting Justice Field and the federal judges here in the discharge of their duties in matters in· which the Terrys are interested. I noted your suggestion with a great degree of pleasure, not because our marshal is at all disposed to leave anything undone within his authority or power to do, but because it encouraged him to know and feel that the Head of our Department was in full sympathy with the efforts being made to protect the judges and vindicate the dignity of our courts.

" I write merely to suggest that there is just reason, in the light of. the past and the threats made by Judge and Mrs. Terry against Justice Field and Judge Sawyer, to apprehend personal violence at any moment and at any place, as well in court as out of court, and that while due caution has always been taken by the marshal when either Judge or Mrs. Terry is about the building in which the courts are held, he has not felt it within his authority to guard either Judge Sawyer or Justice Field against harm when away from the appraisers' building.

" Discretion dictates, however, that a protection should be thrown about them at other times and places, when proceedings are being had before them in which the Terrys are interested, and I verily believe, ·in view of the direful threats made against Justice Field, that he will be in great danger at all times while here.

" Mr. Franks is a prudent, cool, and courageous officer, who will not abuse any authority granted him. I would therefore suggest that he be authorized in his discretion to retain one or more deputies, at such times as he may deem necessary, for the purposes suggested. That publicity may not be given to the matter, it is important that the deputies whom he may select be not known as such, and that efficient service may be assured for the purposes indicated, it seems to me that they should be strangers to the Terrys.

" The Terrys are unable to appreciate that an officer should perform his official duty when that duty in any way requires his efforts to be directed against them. The marshal, his deputies, and myself suffer daily indignities and insults from Mrs.

Terry, in court and out of court, committed in the presence of her husband and without interference upon his part. I do not purpose being deterred from any duty, nor do I purpose being intimidated in the least degree from doing my whole duty in the premises, but I shall feel doubly assured in being able to do so knowing that our marshal has your kind wishes and encouragement in doing everything needed to protect the officers of the court in the discharge of their duties.

"This, of course, is not intended for the public files of your office, nor will it be on file in my office. Prudence dictates great caution on the part of the officials who may be called upon to have anything to do in the premises, and I deem it to be of the greatest importance that the suggestions back and forth be confidential.

"I shall write you further upon the subject of these cases in a few days.

"I have the honor to be, your most obedient servant,

"JOHN T. CAREY,

"U. S. Attorney."

"DEPARTMENT OF JUSTICE,

"WASHINGTON, D. C., May 27, 1889.

"J. C. FRANKS, Esq., United States Marshal, San Francisco, Cal.

"SIR: Referring to former correspondence of the department relating to a possible disorder in the session of the approaching term of court, owing to the small number of bailiffs under your control to preserve order, you are directed to employ certain special deputies at a per diem of five dollars, payable out of the appropriation for fees and expenses of marshals, to be submitted to the court as a separate account from your other accounts against the government for approval, under section 846, Revised Statutes, as an extraordinary expense, that the same may be forwarded to this Department in order to secure executive action and approval.

"Very respectfully, W. H. H. MILLER,

"Attorney General."

The result of this correspondence was that Marshal Franks appointed Mr. Neagle a deputy marshal for the Northern District of California, and gave him special instructions to attend upon Judge Field both in court and while going from one court to another, and protect him from any assault that might be attempted upon him by Terry and wife. Accordingly, when Judge Field went from San Francisco to Los Angeles to hold the Circuit Court of the United States at that place, Mr. Neagle accompanied him, remained with him for the few days that he was engaged in the business of that court, and returned with him to San Francisco.

It appears from the uncontradicted evidence, in the case that while the sleeping-car, in which were Justice Field and Mr. Neagle, stopped a moment in the early morning at Fresno, Terry and wife got on the train. The fact that they were on the train became known to Neagle, and he held a conversation with the conductor as to what peace officers could be found at Lathrop, where the train stopped for breakfast, and the conductor was requested to telegraph to the proper officers of that place to have a constable or some peace officer on the ground when the train should arrive, anticipating that there might be violence attempted by Terry upon Judge Field. It is sufficient, to say that this resulted in no available aid to assist in keeping the peace. When the train arrived, Neagle informed Judge Field of the presence of Terry on the train, and advised him to remain and take his breakfast in the car. This the Judge refused to do, and he and Neagle got out of the car and went into the dining-room, and took seats beside each other in the place assigned them by the person in charge of the breakfast-room, and very shortly after this Terry and wife came into the room; and Mrs. Terry, recognizing Judge Field, turned and left in great haste, while Terry passed beyond where Judge Field and Neagle were and took his seat at another table. It was afterwards ascertained that Mrs. Terry went to the car, and took from it a satchel in which was a revolver. Before she returned to the eating-room, Terry arose from his seat, and, passing around the table in such a way as brought him behind Judge Field, who did not see him or notice him, came

up where he was sitting with his feet under the table, and struck him a blow on the side of his face, which was repeated on the other side. He also had his arm drawn back and his fist doubled up, apparently to strike a third blow, when Neagle, who had been observing him all this time, arose from his seat with his revolver in his hand, and in a very loud voice shouted out: "Stop! stop! I am an officer!" Upon this Terry turned his attention to Neagle, and, as Neagle testifies, seemed to recognize him, and immediately turned his hand to thrust it in his bosom, as Neagle felt sure, with the purpose of drawing a bowie-knife. At this instant Neagle fired two shots from his revolver into the body of Terry, who immediately sank down and died in a few minutes.

Mrs. Terry entered the room with the satchel in her hand just after Terry sank to the floor. She rushed up to the place where he was, threw herself upon his body, made loud exclamations and moans, and commenced inviting the spectators to avenge her wrong upon Field and Neagle. She appeared to be carried away by passion, and in a very earnest manner charged that Field and Neagle had murdered her husband intentionally, and shortly afterwards she appealed to the persons present to examine the body of Terry to see that he had no weapons. This she did once or twice. The satchel which she had, being taken from her, was found to contain a revolver.

These are the material circumstances produced in evidence before the Circuit Court on the hearing of this *habeas corpus* case. It is but a short sketch of a history which is given in over five hundred pages in the record, but we think it is sufficient to enable us to apply the law of the case to the question before us. Without a more minute discussion of this testimony, it produces upon us the conviction of a settled purpose on the part of Terry and his wife, amounting to a conspiracy, to murder Justice Field. And we are quite sure that if Neagle had been merely a brother or a friend of Judge Field, travelling with him, and aware of all the previous relations of Terry to the Judge, — as he was, — of his bitter animosity, his declared purpose to have revenge even to the point

of killing him, he would have been justified in what he did in defence of Mr. Justice Field's life, and possibly of his own.

But such a justification would be a proper subject for consideration on a trial of the case for murder in the courts of the State of California, and there exists no authority in the courts of the United States to discharge the prisoner while held in custody by the State authorities for this offence, unless there be found in aid of the defence of the prisoner some element of power and authority asserted under the government of the United States.

This element is said to be found in the facts that Mr. Justice Field, when attacked, was in the immediate discharge of his duty as judge of the Circuit Courts of the United States within California; that the assault upon him grew out of the animosity of Terry and wife, arising out of the previous discharge of his duty as circuit justice in the case for which they were committed for contempt of court; and that the deputy marshal of the United States, who killed Terry in defence of Field's life, was charged with a duty under the law of the United States to protect Field from the violence which Terry was inflicting, and which was intended to lead to Field's death.

To the inquiry whether this proposition is sustained by law and the facts which we have recited, we now address ourselves.

Mr. Justice Field was a member of the Supreme Court of the United States, and had been a member of that court for over a quarter of a century, during which he had become venerable for his age and for his long and valuable service in that court. The business of the Supreme Court has become so exacting that for many years past the justices of it have been compelled to remain for the larger part of the year in Washington City, from whatever part of the country they may have been appointed. The term for each year, including the necessary travel and preparations to attend at its beginning, has generally lasted from eight to nine months.

But the justices of this court have imposed upon them other duties, the most important of which arise out of the fact that they are also judges of the Circuit Courts of the United States.

Of these circuits there are nine, to each one of which a justice of the Supreme Court is allotted, under section 606 of the Revised Statutes, the provision of which is as follows:

"The chief justice and associate justices of the Supreme Court shall be allotted among the circuits by an order of the court, and a new allotment shall be made whenever it becomes necessary or convenient by reason of the alteration of any circuit, or of the new appointment of a chief justice or associate justice, or otherwise."

Section 610 declares that it "shall be the duty of the chief justice, and of each justice of the Supreme Court, to attend at least one term of the Circuit Court, in each district of the circuit to which he is allotted during every period of two years."

Although this enactment does not require in terms that the justices shall go to their circuits more than once in two years, the effect of it is to compel most of them to do this, because there are so many districts in many of the circuits that it is impossible for the circuit justice to reach them all in one year, and the result of this is that he goes to some of them in one year, and to others in the next year, thus requiring an attendance in the circuit every year.

The justices of the Supreme Court have been members of the Circuit Courts of the United States ever since the organization of the government, and their attendance on the circuit and appearance at the places where the courts are held has always been thought to be a matter of importance. In order to enable him to perform this duty, Mr. Justice Field had to travel each year from Washington City, near the Atlantic coast, to San Francisco, on the Pacific coast. In doing this he was as much in the discharge of a duty imposed upon him by law as he was while sitting in court and trying causes. There are many duties which the judge performs outside of the court-room where he sits to pronounce judgment or to preside over a trial. The statutes of the United States, and the established practice of the courts, require that the judge perform a very large share of his judicial labors at what is called "chambers." This chamber work is as important as necessary, as much a discharge of his official duty as that performed

in the court-house. Important cases are often argued before the judge at any place convenient to the parties concerned, and a decision of the judge is arrived at by investigations made in his own room, wherever he may be, and it is idle to say that this is not as much the performance of judicial duty as the filing of the judgment with the clerk, and the announcement of the result in open court.

So it is impossible for a justice of the Supreme Court of the United States, who is compelled by the obligations of duty to be so much in Washington City, to discharge his duties of attendance on the Circuit Courts as prescribed by section 610, without travelling in the usual and most convenient modes of doing it to the place where the court is to be held. This duty is as much an obligation imposed by the law as if it had said in words "the justices of the Supreme Court shall go from Washington City to the place where their terms are held every year."

Justice Field had not only left Washington and travelled the three thousand miles or more which were necessary to reach his circuit, but he had entered upon the duties of that circuit, had held the court at San Francisco for some time; and, taking a short leave of that court, had gone down to Los Angeles, another place where a court was to be held, and sat as a judge there for several days, hearing cases and rendering decisions. It was in the necessary act of returning from Los Angeles to San Francisco, by the usual mode of travel between the two places, where his court was still in session, and where he was required to be, that he was assaulted by Terry in the manner which we have already described.

The occurrence which we are called upon to consider was of so extraordinary a character that it is not to be expected that many cases can be found to cite as authority upon the subject.

In the case of *United States* v. *The Schooner Little Charles*, 1 Brock. 380, 382, a question arose before Chief Justice Marshall, holding the Circuit Court of the United States for Virginia, as to the validity of an order made by the District Judge at his chambers, and not in court. The act of Congress authorized stated terms of the District Court, and gave the judge

power to hold special courts at his discretion, either at the place appointed by the law or such other place in the district as the nature of the business and his discretion should direct. He says: "It does not seem to be a violent construction of such an act to consider the judge as constituting a court whenever he proceeds on judicial business;" and cites the practice of the courts in support of that view of the subject.

In the case of *United States* v. *Gleason*, 1 Wool. C. C. 128, 132, the prisoner was indicted for the murder of two enrolling officers who were charged with the duty of arresting deserters, or those who had been drafted into the service and had failed to attend. These men, it was said, had visited the region of country where they were murdered, and, having failed of accomplishing their purpose of arresting the deserters, were on their return to their home when they were killed, and the court was asked to instruct the jury that under these circumstances they were not engaged in the duty of arresting the deserters named. "It is claimed by the counsel for the defendant," says the report, "that if the parties killed had been so engaged, and had come to that neighborhood with the purpose of arresting the supposed deserters, but at the moment of the assault had abandoned the purpose of making the arrests at that time, and were returning to headquarters at Grinnell, with a view to making other arrangements for arrest at another time, they were not so engaged as to bring the case within the law." But the court held that this was not a sound construction of the statute, and "that if the parties killed had come into that neighborhood with intent to arrest the deserters named, and had been employed by the proper officer for that service, and were, in the proper prosecution of that purpose, returning to Grinnell with a view to making other arrangements to discharge this duty, they were still engaged in arresting the deserters, within the meaning of the statute. It is not necessary," said the court, "that the party killed should be engaged in the immediate act of arrest, but it is sufficient if he be employed in and about that business when assaulted. The purpose of the law is to protect the life of the person so employed, and this protection continues so

long as he is engaged in a service necessary and proper to that employment."

We have no doubt that Mr. Justice Field when attacked by Terry was engaged in the discharge of his duties as Circuit Justice of the Ninth Circuit, and was entitled to all the protection under those circumstances which the law could give him.

It is urged, however, that there exists no statute authorizing any such protection as that which Neagle was instructed to give Judge Field in the present case, and indeed no protection whatever against a vindictive or malicious assault growing out of the faithful discharge of his official duties; and that the language of section 753 of the Revised Statutes, that the party seeking the benefit of the writ of *habeas corpus* must in this connection show that he is "in custody for an act done or omitted in pursuance of a law of the United States," makes it necessary that upon this occasion it should be shown that the act for which Neagle is imprisoned was done by virtue of an act of Congress. It is not supposed that any special act of Congress exists which authorizes the marshals or deputy marshals of the United States in express terms to accompany the judges of the Supreme Court through their circuits, and act as a body-guard to them, to defend them against malicious assaults against their persons. But we are of opinion that this view of the statute is an unwarranted restriction of the meaning of a law designed to extend in a liberal manner the benefit of the writ of *habeas corpus* to persons imprisoned for the performance of their duty. And we are satisfied that if it was the duty of Neagle, under the circumstances, a duty which could only arise under the laws of the United States, to defend Mr. Justice Field from a murderous attack upon him, he brings himself within the meaning of the section we have recited. This view of the subject is confirmed by the alternative provision, that he must be in custody "for an act done or omitted in pursuance of a law of the United States or of an order, process, or decree of a court or judge thereof, or is in custody in violation of the Constitution or of a law or treaty of the United States."

In the view we take of the Constitution of the United States, any obligation fairly and properly inferrible from that instrument, or any duty of the marshal to be derived from the general scope of his duties under the laws of the United States, is "a law" within the meaning of this phrase. It would be a great reproach to the system of government of the United States, declared to be within its sphere sovereign and supreme, if there is to be found within the domain of its powers no means of protecting the judges, in the conscientious and faithful discharge of their duties, from the malice and hatred of those upon whom their judgments may operate unfavorably.

It has in modern times become apparent that the physical health of the community is more efficiently promoted by hygienic and preventive means, than by the skill which is applied to the cure of disease after it has become fully developed. So also the law, which is intended to prevent crime, in its general spread among the community, by regulations, police organization, and otherwise, which are adapted for the protection of the lives and property of citizens, for the dispersion of mobs, for the arrest of thieves and assassins, for the watch which is kept over the community, as well as over this class of people, is more efficient than punishment of crimes after they have been committed.

If a person in the situation of Judge Field could have no other guarantee of his personal safety, while engaged in the conscientious discharge of a disagreeable duty, than the fact that if he was murdered his murderer would be subject to the laws of a State and by those laws could be punished, the security would be very insufficient. The plan which Terry and wife had in mind of insulting him and assaulting him and drawing him into a defensive physical contest, in the course of which they would slay him, shows the little value of such remedies. We do not believe that the government of the United States is thus inefficient, o · that its Constitution and laws have left the high officers of the government so defenceless and unprotected.

The views expressed by this court through Mr. Justice

Bradley, in *Ex parte Siebold*, 100 U. S. 371, 394, are very pertinent to this subject, and express our views with great force. That was a case of a writ of *habeas corpus*, where Siebold had been indicted in the Circuit Court of the United States for the District of Maryland, for an offence committed against the election laws, during an election at which members of Congress and officers of the State of Maryland were elected. He was convicted, and sentenced to fine and imprisonment, and filed his petition in this court for a writ of *habeas corpus*, to be relieved on the ground that the court which had convicted him was without jurisdiction. The foundation of this allegation was that the Congress of the United States had no right to prescribe laws for the conduct of the election in question, or for enforcing the laws of the State of Maryland by the courts of the United States. In the course of the discussion of the relative powers of the federal and state courts on this subject, it is said :

"Somewhat akin to the argument which has been considered is the objection that the deputy marshals authorized by the act of Congress to be created and to attend the elections are authorized to keep the peace; and that this is a duty which belongs to the state authorities alone. It is argued that the preservation of peace and good order in society is not within the powers confided to the government of the United States, but belongs exclusively to the States. Here again we are met with the theory that the government of the United States does not rest upon the soil and territory of the country. We think that this theory is founded on an entire misconception of the nature and powers of that government. We hold it to be an incontrovertible principle, that the government of the United States may, by means of physical force, exercised through its official agents, execute on every foot of American soil the powers and functions that belong to it. This necessarily involves the power to command obedience to its laws, and hence the power to keep the peace to that extent. This power to enforce its laws and to execute its functions in all places does not derogate from the power of the State to execute its laws at the same time and in the same

places. The one does not exclude the other, except where both cannot be executed at the same time. In that case the words of the Constitution itself show which is to yield. 'This Constitution, and all laws which shall be made in pursuance thereof, . . . shall be the supreme law of the land.' . . . Without the concurrent sovereignty referred to, the national government would be nothing but an advisory government. Its executive power would be absolutely nullified. Why do we have marshals at all, if they cannot physically lay their hands on persons and things in the performance of their proper duties? What functions can they perform, if they cannot use force? In executing the processes of the courts, must they call on the nearest constable for protection? must they rely on him to use the requisite compulsion, and to keep the peace, whilst they are soliciting and entreating the parties and bystanders to allow the law to take its course? This is the necessary consequence of the positions that are assumed. If we indulge in such impracticable views as these, and keep on refining and rerefining, we shall drive the national government out of the United States, and relegate it to the District of Columbia, or perhaps to some foreign soil. We shall bring it back to a condition of greater helplessness than that of the old confederation. . . . It must execute its powers, or it is no government. It must execute them on the land as well as on the sea, on things as well as on persons. And, to do this, it must necessarily have power to command obedience, preserve order, and keep the peace; and no person or power in this land has the right to resist or question its authority, so long as it keeps within the bounds of its jurisdiction."

At the same term of the court, in the case of *Tennessee v. Davis,* 100 U. S. 257, 262, where the same questions in regard to the relative powers of the federal and state courts were concerned, in regard to criminal offences, the court expressed its views through Mr. Justice Strong, quoting from the case of *Martin* v. *Hunter,* 1 Wheat. 363, the following language: "The general government must cease to exist whenever it loses the power of protecting itself in the exercise of its con

stitutional powers;" and then proceeding: "It can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a state court, for an alleged offence against the law of the State, yet warranted by the federal authority they possess, and if the general government is powerless to interfere at once for their protection — if their protection must be left to the action of the state court — the operations of the general government may at any time be arrested at the will of one of its members. The legislation of a State may be unfriendly. It may affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws. It may deny the authority conferred by those laws. The state court may administer not only the laws of the State, but equally federal law, in such a manner as to paralyze the operations of the government. And even if, after trial and final judgment in the state court, the case can be brought into the United States court for review, the officer is withdrawn from the discharge of his duty during the pendency of the prosecution, and the exercise of acknowledged federal power arrested. We do not think such an element of weakness is to be found in the Constitution. The United States is a government with authority extending over the whole territory of the Union, acting upon the States and the people of the States. While it is limited in the number of its powers, so far as its sovereignty extends it is supreme. No state government can exclude it from the exercise of any authority conferred upon it by the Constitution; obstruct its authorized officers against its will; or withhold from it, for a moment, the cognizance of any subject which that instrument has committed to it."

To cite all the cases in which this principle of the supremacy of the government of the United States, in the exercise of all the powers conferred upon it by the Constitution, is maintained, would be an endless task. We have selected these as being the most forcible expressions of the views of the court, having a direct reference to the nature of the case before us.

Where, then, are we to look for the protection which we

have shown Judge Field was entitled to when engaged in the discharge of his official duties? Not to the courts of the United States; because, as has been more than once said in this court, in the division of the powers of government between the three great departments, executive, legislative and judicial, the judicial is the weakest for the purposes of self-protection and for the enforcement of the powers which it exercises. The ministerial officers through whom its commands must be executed are marshals of the United States, and belong emphatically to the executive department of the government. They are appointed by the President, with the advice and consent of the Senate. They are removable from office at his pleasure. They are subjected by act of Congress to the supervision and control of the Department of Justice, in the hands of one of the cabinet officers of the President, and their compensation is provided by acts of Congress. The same may be said of the district attorneys of the United States, who prosecute and defend the claims of the government in the courts.

The legislative branch of the government can only protect the judicial officers by the enactment of laws for that purpose, and the argument we are now combating assumes that no such law has been passed by Congress.

If we turn to the executive department of the government, we find a very different condition of affairs. The Constitution, section 3, Article 2, declares that the President "shall take care that the laws be faithfully executed," and he is provided with the means of fulfilling this obligation by his authority to commission all the officers of the United States, and, by and with the advice and consent of the Senate, to appoint the most important of them and to fill vacancies. He is declared to be commander-in-chief of the army and navy of the United States. The duties which are thus imposed upon him he is further enabled to perform by the recognition in the Constitution, and the creation by acts of Congress, of executive departments, which have varied in number from four or five to seven or eight, the heads of which are familiarly called cabinet ministers. These aid him in the performance of the

great duties of his office, and represent him in a thousand acts
to which it can hardly be supposed his personal attention is
called, and thus he is enabled to fulfil the duty of his great
department, expressed in the phrase that "he shall take care
that the laws be faithfully executed."

Is this duty limited to the enforcement of acts of Congress
or of treaties of the United States according to their *express
terms*, or does it include the rights, duties and obligations
growing out of the Constitution itself, our international rela-
tions, and all the protection implied by the nature of the gov-
ernment under the Constitution ?

One of the most remarkable episodes in the history of our
foreign relations, and which has become an attractive histori-
cal incident, is the case of Martin Koszta, a native of Hun-
gary, who, though not fully a naturalized citizen of the United
States, had in due form of law made his declaration of inten-
tion to become a citizen.   While in Smyrna he was seized by
command of the Austrian consul general at that place, and
carried on board the Hussar, an Austrian vessel, where he was
held in close confinement.   Captain Ingraham, in command
of the American sloop of war St. Louis, arriving in port at
that critical period, and ascertaining that Koszta had with
him his naturalization papers, demanded his surrender to him,
and was compelled to train his guns upon the Austrian vessel
before his demands were complied with.   It was, however, to
prevent bloodshed, agreed that Koszta should be placed in the
hands of the French consul subject to the result of diplomatic
negotiations between Austria and the United States.   The
celebrated correspondence between Mr. Marcy, Secretary of
State, and Chevalier Hülsemann, the Austrian minister at
Washington, which arose out of this affair and resulted in the
release and restoration to liberty of Koszta, attracted a great
deal of public attention, and the position assumed by Mr.
Marcy met the approval of the country and of Congress, who
voted a gold medal to Captain Ingraham for his conduct in
the affair.   Upon what act of Congress then existing can any
one lay his finger in support of the action of our government
in this matter ?

So, if the President or the Postmaster General is advised that the mails of the United States, possibly carrying treasure, are liable to be robbed and the mail carriers assaulted and murdered in any particular region of country, who can doubt the authority of the President or of one of the executive departments under him to make an order for the protection of the mail and of the persons and lives of its carriers, by doing exactly what was done in the case of Mr. Justice Field, namely, providing a sufficient guard, whether it be by soldiers of the army or by marshals of the United States, with a *posse comitatus* properly armed and equipped, to secure the safe performance of the duty of carrying the mail wherever it may be intended to go?

The United States is the owner of millions of acres of valuable public land, and has been the owner of much more which it has sold. Some of these lands owe a large part of their value to the forests which grow upon them. These forests are liable to depredations by people living in the neighborhood, known as timber thieves, who make a living by cutting and selling such timber, and who are trespassers. But until quite recently, even if there be one now, there was no statute authorizing any preventive measures for the protection of this valuable public property. Has the President no authority to place guards upon the public territory to protect its timber? No authority to seize the timber when cut and found upon the ground? Has he no power to take any measures to protect this vast domain? Fortunately we find this question answered by this court in the case of *Wells* v. *Nickles*, 104 U. S. 444. That was a case in which a class of men appointed by local land officers, under instructions from the Secretary of the Interior, having found a large quantity of this timber cut down from the forests of the United States and lying where it was cut, seized it. The question of the title to this property coming in controversy between Wells and Nickles, it became essential to inquire into the authority of these timber agents of the government thus to seize the timber cut by trespassers on its lands. The court said: "The effort we have made to ascertain and fix the authority of these timber agents by any

positive provision of law has been unsuccessful.". But the court, notwithstanding there was no special statute for it, held that the Department of the Interior, acting under the idea of protecting from depredation timber on the lands of the government, had gradually come to assert the right to seize what is cut and taken away from them wherever it can be traced, and in aid of this the registers and receivers of the Land Office had, by instructions from the Secretary of the Interior, been constituted agents of the United States for these purposes, with power to appoint special agents under themselves. And the court upheld the authority of the Secretary of the Interior to make these rules and regulations for the protection of the public lands.

One of the cases in this court in which this question was presented in the most imposing form is that of *United States* v. *San Jacinto Tin Company*, 125 U. S. 273, 279, 280. In that case, a suit was brought in the name of the United States, by order of the Attorney General, to set aside a patent which had been issued for a large body of valuable land, on the ground that it was obtained from the government by fraud and deceit practised upon its officers. A preliminary question was raised by counsel for defendant, which was earnestly insisted upon, as to the right of the Attorney General or any other officer of the government to institute such a suit in the absence of any act of Congress authorizing it. It was conceded that there was no express authority given to the Attorney General to institute that particular suit or any suit of that class. The question was one of very great interest, and was very ably argued both in the court below and in this court. The response of this court to that suggestion conceded that in the acts of Congress establishing the Department of Justice and defining the duties of the Attorney General there was no such express authority, and it was said that there was also no express authority to him to bring suits against debtors of the government upon bonds, or to begin criminal prosecutions, or to institute criminal proceedings in any of the cases in which the United States was plaintiff, yet he was invested with the general superintendence of all such suits. It was further said:

"If the United States, in any particular case, has a just cause for calling upon the judiciary of the country, in any of its courts, for relief by setting aside or annulling any of its contracts, its obligations, or its most solemn instruments, the question of the appeal to the judicial tribunals of the country must primarily be decided by the Attorney General of the United States. That such a power should exist somewhere, and that the United States should not be more helpless in relieving itself of frauds, impostures, and deceptions, than the private individual, is hardly open to argument. . . . There must, then, be an officer or officers of the government to determine when the United States shall sue, to decide for what it shall sue, and to be responsible that such suits shall be brought in appropriate cases. The attorneys of the United States in every judicial district are officers of this character, and they are by statute under the immediate supervision and control of the Attorney General. How, then, can it be argued that if the United States has been deceived, entrapped, or defrauded, into the making, under the forms of law, of an instrument which injuriously affects its rights of property, or other rights, it cannot bring a suit to avoid the effect of such instrument, thus fraudulently obtained, without a special act of Congress in each case, or without some special authority applicable to this class of cases?" The same question was raised in the earlier case of *United States* v. *Hughes*, 11 How. 552, and decided the same way.

We cannot doubt the power of the President to take measures for the protection of a judge of one of the courts of the United States, who, while in the discharge of the duties of his office, is threatened with a personal attack which may probably result in his death, and we think it clear that where this protection is to be afforded through the civil power, the Department of Justice is the proper one to set in motion the necessary means of protection. The correspondence already recited in this opinion between the marshal of the Northern District of California, and the Attorney General, and the district attorney of the United States for that district, although prescribing no very specific mode of affording this

protection by the Attorney General, is sufficient, we think, to warrant the marshal in taking the steps which he did take, in making the provisions which he did make, for the protection and defence of Mr. Justice Field.

But there is positive law investing the marshals and their deputies with powers which not only justify what Marshal Neagle did in this matter, but which imposed it upon him as a duty. In chapter fourteen of the Revised Statutes of the United States, which is devoted to the appointment and duties of the district attorneys, marshals, and clerks of the courts of the United States, section 788 declares:

"The marshals and their deputies shall have, in each State, the same powers, in executing the laws of the United States, as the sheriffs and their deputies in such State may have, by law, in executing the laws thereof."

If, therefore, a sheriff of the State of California was authorized to do in regard to the laws of California what Neagle did, that is, if he was authorized to keep the peace, to protect a judge from assault and murder, then Neagle was authorized to do the same thing in reference to the laws of the United States.

Section 4176 of the Political Code of California reads as follows:

"The sheriff must:

"First. Preserve the peace.

"Second. Arrest and take before the nearest magistrate for examination all persons who attempt to commit or have committed a public offence.

"Third. Prevent and suppress all affrays, breaches of the peace, riots and insurrections, which may come to his knowledge. . . . ."

And the Penal Code of California declares (section 197) that homicide is justifiable when committed by any person "when resisting any attempt to murder any person or to commit a felony or to do some great bodily injury upon any person;" or "when committed in defence of habitation, property or person against one who manifestly intends or endeavors by violence or surprise to commit a felony."

That there is a peace of the United States; that a man assaulting a judge of the United States while in the discharge of his duties violates that peace; that in such case the marshal of the United States stands in the same relation to the peace of the United States which the sheriff of the county does to the peace of the State of California; are questions too clear to need argument to prove them. That it would be the duty of a sheriff, if one had been present at this assault by Terry upon Judge Field, to prevent this breach of the peace, to prevent this assault, to prevent the murder which was contemplated by it, cannot be doubted. And if, in performing this duty, it became necessary for the protection of Judge Field, or of himself, to kill Terry, in a case where, like this, it was evidently a question of the choice of who should be killed, the assailant and violator of the law and disturber of the peace, or the unoffending man who was in his power, there can be no question of the authority of the sheriff to have killed Terry. So the marshal of the United States, charged with the duty of protecting and guarding the judge of the United States court against this special assault upon his person and his life, being present at the critical moment, when prompt action was necessary, found it to be his duty, a duty which he had no liberty to refuse to perform, to take the steps which resulted in Terry's death. This duty was imposed on him by the section of the Revised Statutes which we have recited, in connection with the powers conferred by the State of California upon its peace officers, which become, by this statute, in proper cases, transferred as duties to the marshals of the United States.

But all these questions being conceded, it is urged against the relief sought by this writ of *habeas corpus*, that the question of the guilt of the prisoner of the crime of murder is a question to be determined by the laws of California, and to be decided by its courts, and that there exists no power in the government of the United States to take away the prisoner from the custody of the proper authorities of the State of California and carry him before a judge of the court of the United States, and release him without a trial by jury accord-

ing to the laws of the State of California. That the statute of the United States authorizes and directs such a proceeding and such a judgment in a case where the offence charged against the prisoner consists in an act done in pursuance of a law of the United States and by virtue of its authority, and where the imprisonment of the party is in violation of the Constitution and laws of the United States, is clear by its express language.

The enactments now found in the Revised Statutes of the United States on the subject of the writ of *habeas corpus* are the result of a long course of legislation forced upon Congress by the attempt of the States of the Union to exercise the power of imprisonment over officers and other persons asserting rights under the federal government or foreign governments, which the States denied. The original act of Congress on the subject of the writ of *habeas corpus*, by its 14th section, authorized the judges and the courts of the United States, in the case of prisoners in jail or in custody under or by color of the authority of the United States, or committed for trial before some court of the same, or when necessary to be brought into court to testify, to issue the writ, and the judge or court before whom they were brought was directed to make inquiry into the cause of commitment. 1 Stat. 81, c. 20, § 14. This did not present the question, or, at least, it gave rise to no question which came before the courts, as to releasing by this writ parties held in custody under the laws of the States. But when, during the controversy growing out of the nullification laws of South Carolina, officers of the United States were arrested and imprisoned for the performance of their duties in collecting the revenue of the United States in that State, and held by the state authorities, it became necessary for the Congress of the United States to take some action for their relief. Accordingly the act of Congress of March 2, 1833, 4 Stat. 634, c. 57, § 7, among other remedies for such condition of affairs, provided, by its 7th section, that the federal judges should grant writs of *habeas corpus* in all cases of a prisoner in jail or confinement, where he should be committed or confined on or by any authority or law, for any act

done, or omitted to be done, in pursuance of a law of the United States, or any order, process or decree of any judge or court thereof.

The next extension of the circumstances on which a writ of *habeas corpus* might issue by the federal judges arose out of the celebrated *McLeod Case*, in which McLeod, charged with murder, in a state court of New York, had pleaded that he was a British subject, and that what he had done was under and by the authority of his government, and should be a matter of international adjustment, and that he was not subject to be tried by a court of New York under the laws of that State. The federal government acknowledged the force of this reasoning, and undertook to obtain from the government of the State of New York the release of the prisoner, but failed. He was, however, tried and acquitted, and afterwards released by the State of New York. This led to an extension of the powers of the federal judges under the writ of *habeas corpus*, by the act of August 29, 1842, 5 Stat. 539, c. 257, entitled " An act to provide further remedial justice in the courts of the United States." It conferred upon them the power to issue a writ of *habeas corpus* in all cases where the prisoner claimed that the act for which he was held in custody was done under the sanction of any foreign power, and where the validity and effect of this plea depended upon the law of nations. In advocating the bill, which afterwards became a law, on this subject, Senator Berrien, who introduced it into the Senate, observed: " The object was to allow a foreigner, prosecuted in one of the States of the Union for an offence committed in that State, but which he pleads has been committed under authority of his own sovereign or the authority of the law of nations, to be brought up on that issue before the only competent judicial power to decide upon matters involved in foreign relations or the law of nations. The plea must show that it has reference to the laws or treaties of the United States or the law of nations, and showing this, the writ of *habeas corpus* is awarded to try that issue. If it shall appear that the accused has a bar on the plea alleged, it is right and proper that he should not be delayed in prison awaiting the

proceedings of the state jurisdiction on the preliminary issue of his plea at bar. If satisfied of the existence in fact and validity in law of the bar, the federal jurisdiction will have the power of administering prompt relief." No more forcible statement of the principle on which the law of the case now before us stands can be made.

The next extension of the powers of the court under the writ of *habeas corpus* was the act of February 5, 1867, 14 Stat. 385, c. 28, and this contains the broad ground of the present Revised Statutes, under which the relief is sought in the case before us, and includes all cases of restraint of liberty in violation of the Constitution or a law or treaty of the United States, and declares that "the said court or judge shall proceed in a summary way to determine the facts of the case, by hearing testimony and the arguments of the parties interested, and if it shall appear that the petitioner is deprived of his or her liberty in contravention of the Constitution or laws of the United States, he or she shall forthwith be discharged and set at liberty."

It would seem as if the argument might close here. If the duty of the United States to protect its officers from violence, even to death, in discharge of the duties which its laws impose upon them, be established, and Congress has made the writ of *habeas corpus* one of the means by which this protection is made efficient, and if the facts of this case show that the prisoner was acting both under the authority of law, and the directions of his superior officers of the Department of Justice, we can see no reason why this writ should not be made to serve its purpose in the present case.

We have already cited such decisions of this court as are most important and directly in point, and there is a series of cases decided by the Circuit and District Courts to the same purport. Several of these arose out of proceedings under the fugitive slave law, in which the marshal of the United States, while engaged in apprehending the fugitive slave with a view to returning him to his master in another State, was arrested by the authorities of the State. In many of these cases they made application to the judges of the United States for relief

by the writ of *habeas corpus*, which give rise to several very
interesting decisions on this subject.

In *Ex parte Jenkins*, 2 Wall. Jr. 521, 529, the marshal, who
had been engaged, while executing a warrant, in arresting a
fugitive, in a bloody encounter, was himself arrested under a
warrant of a justice of the peace for assault with intent to
kill, which makes the case very analogous to the one now
under consideration. He presented to the Circuit Court of
the United States for the Eastern District of Pennsylvania a
petition for a writ of *habeas corpus*, which was heard before
Mr. Justice Grier, who held that under the act of 1833,
already referred to, the marshal was entitled to his discharge,
because what he had done was in pursuance of and by the au-
thority conferred upon him by the act of Congress concerning
the rendition of fugitive slaves. He said: "The authority
conferred on the judges of the United States by this act of
Congress gives them all the power that any other court could
exercise under the writ of *habeas corpus*, or gives them none
at all. If under such a writ they may not discharge their
officer when imprisoned 'by any authority' for an act done in
pursuance of a law of the United States, it would be impossi-
ble to discover for what useful purpose the act was passed."
It "was passed when a certain State of this Union had threat-
ened to nullify acts of Congress, and to treat those as crimi-
nals who should attempt to execute them; and it was intended
as a remedy against such state legislation."

This same matter was up again when the fugitive slave,
Thomas, had the marshal arrested in a civil suit for an alleged
assault and battery. He was carried before Judge Kane on
another writ of *habeas corpus* and again released. 2 Wall. Jr.
531. A third time the marshal, being indicted, was arrested
on a bench warrant issued by the state court, and again
brought before the Circuit Court of the United States by
a writ of *habeas corpus* and discharged. Some remarks of
Judge Kane on this occasion are very pertinent to the objec-
tions raised in the present case. He said, 2 Wall. Jr. 543:
"It has been urged that my order, if it shall withdraw the
relators from the prosecution pending against them [in the

state court], will in effect prevent their trial by jury at all, since there is no act of Congress under which they can be indicted for an abuse of process. It will not be an anomaly, however, if the action of this court shall interfere with the trial of these prisoners by a jury. Our constitutions secure that mode of trial as a right to the accused; but they nowhere recognize it as a right of the government, either state or federal, still less of an individual prosecutor. The action of a jury is overruled constantly by the granting of new trials after conviction. It is arrested by the entering of *nolle prose-quis*, while the case is at bar. It is made ineffectual at any time by the discharge on *habeas corpus*. . . . And there is no harm in this. No one imagines that because a man is accused he must therefore, of course, be tried. Public prosecutions are not devised for the purpose of indemnifying the wrongs of individuals, still less of retaliating upon them."

Many other decisions by the Circuit and District Courts, to the same purport, are to be found, among them the following: *Ex parte Robinson*, 6 McLean, 355; 4 Amer. Law Register, 617; *Roberts* v. *Jailor of Fayette Co.*, 2 Abbott (U. S.) 265; *In re Ramsey*, 2 Flippin, 451; *In re Neill*, 8 Blatchford, 156; *Ex parte Bridges*, 2 Woods, 428; *Ex parte Royall*, 117 U. S. 241.

Similar language was used by Mr. Choate in the Senate of the United States upon the passage of the act of 1842. He said: "If you have the power to interpose after judgment, you have the power to do so before. If you can reverse a judgment, you can anticipate its rendition. If, within the Constitution, your judicial power extends to these cases or these controversies, whether you take hold of the case or controversy at one stage or another, is totally immaterial. The single question submitted to the national tribunal, the question whether, under the statute adopting the law of nations, the prisoner is entitled to the exemption or immunity he claims, may as well be extracted from the entire case, and presented and decided in those tribunals before any judgment in the state court, as for it to be revised afterwards on a writ of error. Either way, they pass on no other question. Either

way, they do not administer the criminal law of a State. In the one case as much as in the other, and no more, do they interfere with state judicial power."

The same answer is given in the present case. To the objection made in argument, that the prisoner is discharged by this writ from the power of the state court to try him for the whole offence, the reply is, that if the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if in doing that act he did no more than what was necessary and proper for him to do, he *cannot* be guilty of a crime under the law of the State of California. When these things are shown, it is established that he is innocent of any crime against the laws of the State, or of any other authority whatever. There is no occasion for any further trial in the state court, or in any court. The Circuit Court of the United States was as competent to ascertain these facts as any other tribunal, and it was not at all necessary that a jury should be impanelled to render a verdict on them. It is the exercise of a power common under all systems of criminal jurisprudence. There must always be a preliminary examination by a committing magistrate, or some similar authority, as to whether there is an offence to be submitted to a jury, and if this is submitted in the first instance to a grand jury, that is still not the right of trial by jury which is insisted on in the present argument.

We have thus given, in this case, a most attentive consideration to all the questions of law and fact which we have thought to be properly involved in it. We have felt it to be our duty to examine into the facts with a completeness justified by the importance of the case, as well as from the duty imposed upon us by the statute, which we think requires of us to place ourselves, as far as possible, in the place of the Circuit Court and to examine the testimony and the arguments in it, and to dispose of the party as law and justice require.

The result at which we have arrived upon this examination is, that in the protection of the person and the life of Mr. Justice Field while in the discharge of his official duties,

Neagle was authorized to resist the attack of Terry upon him; that Neagle was correct in the belief that without prompt action on his part the assault of Terry upon the judge would have ended in the death of the latter; that such being his well-founded belief, he was justified in taking the life of Terry, as the only means of preventing the death of the man who was intended to be his victim; that in taking the life of Terry, under the circumstances, he was acting under the authority of the law of the United States, and was justified in so doing; and that he is not liable to answer in the courts of California on account of his part in that transaction.

*We therefore affirm the judgment of the Circuit Court authorizing his discharge from the custody of the sheriff of San Joaquin County.*

MR. JUSTICE LAMAR (with whom concurred MR. CHIEF JUSTICE FULLER) dissenting.

The Chief Justice and myself are unable to assent to the conclusion reached by the majority of the court.

Our dissent is not based on any conviction as to the guilt or innocence of the appellee. The view which we take renders that question immaterial to the inquiry presented by this appeal. That inquiry is, whether the appellee, Neagle, shall in this *ex parte* proceeding be discharged and delivered from any trial or further inquiry in any court, state or federal, for what he has been accused of in the forms prescribed by the constitution and laws of the State in which the act in question was committed. Upon that issue we hold to the principle announced by this court in the case of *Ex parte Crouch*, 112 U. S., 178, 180, in which Mr. Chief Justice Waite, delivering the opinion of the court, said : " It is elementary learning that, if a prisoner is in the custody of a state court of competent jurisdiction, not illegally asserted, he cannot be taken from that jurisdiction and discharged on *habeas corpus* issued by a court of the United States, simply because he is not guilty of the offence for which he is held. All questions which may arise in the orderly course of the proceeding against him are to

be determined by the court to whose jurisdiction he has been subjected, and no other court is authorized to interfere to prevent it. Here the right of the prisoner to a discharge depends alone on the sufficiency of his defence to the information under which he is held. Whether his defence is sufficient or not is for the court which tries him to determine. If, in this determination, errors are committed, they can only be corrected in an appropriate form of proceeding for that purpose. The office of a writ of *habeas corpus* is neither to correct such errors, nor to take the prisoner away from the court which holds him for trial, for fear, if he remains, they may be committed. Authorities to this effect in our own reports are numerous. *Ex parte Watkins,* 3 Pet. 202 ; *Ex parte Lange,* 18 Wall. 163, 166 ; *Ex parte Parks,* 92 U. S. 18, 23 ; *Ex parte Siebold,* 100 U. S. 371, 374 ; *Ex parte Virginia,* 100 U. S. 339, 343 ; *Ex parte Rowland,* 104 U. S. 604, 612 ; *Ex parte Curtis,* 106 U. S. 371, 375 ; *Ex parte Yarbrough,* 110 U. S. 651, 653."

Many of the propositions advanced in behalf of the appellee and urged with impressive force we do not challenge. We do not question, for instance, the soundness of the elaborate discussion of the history of the office and function of the writ of *habeas corpus*, its operation under and by virtue of section 753 of the Revised Statutes, or the propriety of its use in the manner and for the purposes for which it has been used, in any case where the prisoner is under arrest by a State for an act done " in pursuance of a law of the United States." Nor do we contend that any objection arises to such use of the writ, and based merely on that fact, in cases where no provision is made by the federal law for the trial and conviction of the accused. Nor do we question the general propositions, that the federal government established by the Constitution is absolutely sovereign over every foot of soil, and over every person, within the national territory, within the sphere of action assigned to it; and that within that sphere its constitution and laws are the supreme law of the land, and its proper instrumentalities of government can be subjected to no restraint, and can be held to no accountability whatever. Nor, again, do we dispute the proposition that whatever is necessarily im-.

plied in the Constitution and laws of the United States is as
much a part of them as if it were actually expressed. All
these questions we pretermit.

The recognition by this court, including ourselves, of their
soundness does not in the least elucidate the case; for they
lie outside of the true controversy. The ground on which we
dissent, and which in and by itself seems to be fatal to the
case of the appellee, is this: That in treating section 753 of
the Revised Statutes as an act of authority for this particular
use of the writ a wholly inadmissible construction is placed on
the word "law," as used in that statute, and a wholly inad-
missible application is made of the clause "in custody in vio-
lation of the Constitution  . . .  of the United States."

It will not be necessary to consider these two propositions
separately, for they are called into this case as practically one.

The section referred to is as follows:

"The writ of *habeas corpus* shall in no case extend to a
prisoner in jail, unless where he is in custody under or by
color of the authority of the United States, or is committed
for trial before some court thereof; or is in custody for an act
done or omitted in pursuance of a law of the United States, or
of an order, process, or decree of a court or judge thereof;
or is in custody in violation of the Constitution or of a law
or treaty of the United States," etc.

It is not contended in behalf of the appellee that the writ
of *habeas corpus* could be used, as here it is, in any case, with-
out authority of a statute. In *Ex parte Bollman,* 4 Cranch,
75, 94, Chief Justice Marshall said: "The power to award the
writ [of *habeas corpus*] by any of the courts of the United
States must be given by written law."

It is not contended that there is any statute other than
those now found in the Revised Statutes of the United States.
Nor is it contended that in those statutes there is any author-
ity for the use here made of the writ other than what is em-
braced in the clauses above quoted. The issue, as stated
above, is thus narrowed to the proper force to be attributed
to those clauses.

It is stated as the vital position in appellee's case, that it is not

supposed that any special act of Congress exists which author-
izes the marshals or deputy marshals of the United States in
express terms to accompany the judges of the Supreme Court
through their circuits and act as a body guard to them to
defend them against malicious assaults against their persons;
that in the view taken of the Constitution of the United
States, any obligation fairly and properly inferrible from that
instrument, or any duty of the marshal to be derived from the
general scope of his duties under the laws of the United
States, is "a law" within the meaning of this phrase; and that
it would be a great reproach to the system of government of
the United States, declared to be within its sphere sovereign
and supreme, if there was to be found within the domain of
its powers no means of protecting the judges, in the conscien-
tious and faithful discharge of their duties, from the malice
and hatred of those upon whom their judgments might oper-
ate unfavorably. In considering this position, it is indispensa-
ble to observe carefully the distinction between the individual
man Neagle, and the same person in his official capacity as a
deputy marshal of the United States; and also the individual
man whose life he defended, and the same person in his official
capacity of a Circuit Justice of the United States.

The practical importance of the distinction between the
rights and liabilities of a person in his private character, and
the authority and immunity of the same person in his official
capacity, is clearly pointed out and illustrated in *United States
v. Kirby*, 7 Wall. 482, 486, in which the court says: "No offi-
cer or employé of the United States is placed by his position,
or the services he is called to perform, above responsibility to
the legal tribunals of the country, and to the ordinary pro-
cesses for his arrest and detention, when accused of felony, in
the forms prescribed by the Constitution and laws." And the
court adds: "Indeed, it may be doubted whether it is compe-
tent for Congress to exempt the employés of the United
States from arrest on criminal process from the state courts,
when the crimes charged against them are not merely *mala
prohibita*, but are *mala in se*. But whether legislation of that
character be constitutional or not, no intention to extend such

exemption should be attributed to Congress unless clearly manifested by its language."

Now, we agree, taking the facts of the case as they are shown by the record, that the personal protection of Mr. Justice Field, as a private citizen, even to the death of Terry, was not only the right, but was also the duty of Neagle and of any other bystander. And we maintain that for the exercise of that right or duty he is answerable to the courts of the State of California, and to them alone. But we deny that upon the facts of this record, he, as deputy marshal Neagle, or as private citizen Neagle, had any duty imposed on him by the laws of the United States growing out of the official character of Judge Field as a Circuit Justice. We deny that anywhere in this transaction, accepting throughout the appellee's version of the facts, he occupied in law any position other than what would have been occupied by any other person who should have interfered in the same manner, in any other assault of the same character, between any two other persons in that room. In short, we think that there was nothing whatever in fact of an official character in the transaction, whatever may have been the appellee's view of his alleged official duties and powers; and, therefore, we think that the courts of the United States have in the present state of our legislation no jurisdiction whatever in the premises, and that the appellee should have been remanded to the custody of the sheriff.

The contention of the appellee, however, is that it was his official duty as United States marshal to protect the justice; and that for so doing in discharge of this duty, " which could only arise under the laws of the United States," his detention by the state courts brings the case within section 753 of the Revised Statutes, as aforesaid.

We shall therefore address ourselves as briefly as is consistent with the gravity of the question involved, to a consideration of the justice of that claim. We must, however, call attention again to the formal and deliberate admission that it is not pretended that there is any *single* specific statute making it, in so many words, Neagle's duty to protect the justice. The position assumed is, and is wholly, that the authority

and duty to protect the justice did arise directly and necessarily out of the Constitution and positive congressional enactments.

The Attorney General of the United States has appeared in this case for the appellee, in behalf of the government; and in order that the grounds upon which the government relies in support of its claim against the State of California that Neagle should be discharged on this writ may fully appear, it is proper to give some of his most important propositions in his own language. He maintains that " it was the duty of the judiciary, having been thus protected by the executive department, to sit in judgment upon and to vindicate the officer of the executive department, if innocent, in the discharge of his duty, because such authority in the federal judiciary is essential in principle to the existence of the nation." " We insist that, by the Constitution of the United States, a government was created possessed of all the powers necessary to existence as an independent nation; that these powers were distributed in three great constitutional departments, and that each of these departments is, by that Constitution, invested with all of those governmental powers naturally belonging to such department which have not been expressly withheld by the terms of the Constitution. In other words, that Congress is invested not only with expressed but with implied legislative powers; that the judiciary is invested not only with expressed powers granted in the Constitution as its share of the government, but with all the judicial powers which have not been expressly withheld from it; and that the President, in like manner, by the very fact that he is made the chief executive of the nation, and is charged to protect, preserve, and defend the Constitution, and to take care that the laws are faithfully executed, is invested with necessary and implied executive powers which neither of the other branches of the government can either take away or abridge; that many of these powers pertaining to each branch of the government are self-executing, and in no way dependent, except as to the ways and means, upon legislation."

"The Constitution provides that before the President enters

upon the execution of his office he shall take an oath — I do solemnly swear that I will faithfully execute the office of President of the United States, and will to the best of my ability *preserve, protect and defend* the Constitution of the United States." And he asks: "Has this clause no significance? Does it not, by necessary implication, invest the President with self-executing powers; that is, powers independent of statute?"

In reply to these propositions, we have this to say: We recognize that the powers of the government, "within its sphere," as defined by the Constitution, and interpreted by the well-settled principles which have resulted from a century of wise and patriotic analysis, are supreme; that these supreme powers extend to the protection of itself and all of its agencies, as well as to the preservation and the perpetuation of its usefulness; and that these powers may be found not only in the express authorities conferred by the Constitution, but also in necessary and proper implications. But while that is all true, it is also true that the powers must be exercised, not only by the organs, but also in conformity with the modes, prescribed by the Constitution itself. These great federal powers, whose existence in all their plenitude and energy is incontestable, are not autocratic and lawless; they are organized powers, committed by the people to the hands of their servants for their own government, and distributed among the legislative, executive, and judicial departments; they are not *extra* the Constitution, for, in and by that Constitution, and in and by it alone, the United States, as a great democratic federal republic, was called into existence, and finds its continued existence possible. In that instrument is found not only the answer to the general line of argument pursued in this case, but also to the specific question propounded by the Attorney General in respect to the President's oath, and its implications.

The President is sworn to "preserve, protect and defend the Constitution." That oath *has* great significance. The sections which follow that prescribing the oath (secs. 2 and 3 of Art. 2) prescribe the duties and fix the powers of the President. But one very prominent feature of the Constitution

which he is sworn to preserve, and which the whole body of the judiciary are bound to enforce, is the closing paragraph of sec. 8, Art. 1, in which it is declared that "the Congress shall have power . . . to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

This clause is that which contains the germ of all the implication of powers under the Constitution. It is that which has built up the Congress of the United States into the most august and imposing legislative assembly in the world; and which has secured vigor to the practical operations of the government, and at the same time tended largely to preserve the equilibrium of its various powers among its co-ordinate departments, as partitioned by that instrument. And that clause alone, conclusively refutes the assertion of the Attorney General, that it was "the duty of the executive department of the United States to guard and protect, at any hazard, the life of Mr. Justice Field in the discharge of his duty, because such protection is essential to the existence of the government." Waiving the question of the essentiality of any such protection to the existence of the government, the manifest answer is, that the protection needed and to be given must proceed not from the President, but primarily from Congress. Again, while it is the President's duty to take care that the laws be faithfully executed, it is not his duty to *make* laws or a law of the United States. The laws he is to see executed are manifestly those contained in the Constitution, and those enacted by Congress, whose duty it is to make all laws necessary and proper for carrying into execution the powers of those tribunals. In fact, for the President to have undertaken to make any law of the United States pertinent to this matter would have been to invade the domain of power expressly committed by the Constitution exclusively to Congress. That body was perfectly able to pass such laws as it should deem expedient in reference to such matter; indeed, it has passed such laws in reference to

elections, expressly directing the United States marshals to attend places of election, to act as peace officers, to arrest with and without process, and to protect the supervisors of election in the discharge of their duties; and there was not the slightest legal necessity out of which to imply any such power in the President.

For these reasons the letters of the Attorney General to Marshal Franks, granting that they did import what is claimed, and granting that the Attorney General was to all intents and purposes, *pro hac vice*, the President, invested Neagle with no special powers whatever. They were, if so construed, without authority of law, and Neagle was then, and there a simple deputy marshal, — no more and no less.

To illustrate the large sphere of powers self-executing and independent of statutes claimed to be vested in the executive, reference is made to the continually recurring cases of the President's interference for the protection of our foreign-born and naturalized citizens on a visit to their native country; and we are cited, as a striking instance of the exercise of such power, to the case of Martin Kozsta, who, though not fully a naturalized citizen of the United States, had in due form of law made his declaration of intention to become a citizen, and who, whilst at Smyrna, was seized by order of an Austrian official and confined on board an Austrian vessel, and who, being afterwards delivered up to Captain Ingraham, commanding an American war vessel, in compliance with a demand, backed by a demonstration of force, on the part of that officer, was placed in the hands of a French consul subject to negotiations between the American and Austrian governments, resulting in the famous correspondence between the American Secretary of State, Mr. Marcy, and the Chevalier Hülsemann, representing the Austrian government, and the restoration of Kozsta to freedom. We are asked: — Upon what express statute of Congress then existing can this act of the government be justified?

We answer, that such action of the government was justified because it pertained to the foreign relations of the United States, in respect to which the federal government is the ex-

clusive representative and embodiment of the entire sovereignty of the nation, in its united character; for to foreign nations, and in our intercourse with them, states and state governments, and even the internal adjustment of federal power, with its complex system of checks and balances, are unknown, and the only authority those nations are permitted to deal with is the authority of the nation as a unit.

That authority the Constitution vests expressly and conclusively in the treaty-making power — the President and Senate — by one simple and comprehensive grant : " He [the President] shall have power, by and with the advice and consent of the Senate, to make treaties, provided two-thirds of the senators present concur." This broad grant makes enumeration of particular powers unnecessary. All other delegations of powers in reference to the international relations of this country are carefully and specifically enumerated and assigned, one by one, to their designated departments. In reply, therefore, to the question, what law expressly justifies such action, we answer, the organic law, the Constitution, which expressly commits all matters pertaining to our diplomatic negotiations, to the treaty-making power.

Other cases are referred to in illustration of the same point; but the one which it is alleged presents that principle in the most imposing form is that of *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273. In that case a suit was brought in the name of the United States, by order of the Attorney General, to set aside a patent which had been issued for a large body of land, on the ground that it had been obtained from the government by fraud and deceit practised upon its officers. There are, it is true, some expressions in the opinion delivered in that case which seem to admit that there is no specific act of Congress expressly authorizing the Attorney General to bring suit for the annulment of a patent procured by fraud from the government; but a close examination of the doctrine of the court shows that it goes no farther than the assertion that the authority of the Attorney General arises by implication, directly and immediately, out of the express law of Congress. The opinion quotes the clause of the Constitution

which declares that the judicial power shall extend to all cases to which the United States shall be a party, and says that this means, mainly, where it is a party plaintiff. It then refers to the statute of Congress which expressly directs the United States District Attorneys to bring suits in behalf of the government; and that the suits thus brought by them are to be under the immediate superintendence and control of the Attorney General. The utmost extent to which the court goes is, that whilst admitting there is no express authority in the Attorney General to institute the suit, yet such authority is directly and necessarily involved in the express provisions of the statute vesting him with the entire control and superintendence of such suits, and the provision and control of the District Attorneys in their conduct of them.

Equally conclusive is the answer which the Constitution makes to the assertion that by the Constitution the judiciary is invested, not only with the express powers granted in the Constitution as its share of the government, but with all the judicial powers which have not been expressly withheld from it. It may be found in the clause which declares that " The Congress shall have power . ... to constitute tribunals inferior to the Supreme Court;" and in that which declares it shall make all laws necessary and proper for carrying into execution the powers of those tribunals. The correlation between those clauses is manifest and unmistakable. If Congress can and must, by the very terms of the Constitution, make all laws proper for carrying into execution all the powers of any department of the government, and if it can create the Circuit Court, expand its powers, abridge them, and abolish the court at will, how can it be that that court, at the least, shall have any implied powers derived from the Constitution and independent of the statutes? And yet, in this transaction, it must be remembered that Mr. Justice Field is only claimed to be the representative of that court.

Not only do the foregoing views seem to us to be the logical and unavoidable results of original and independent studies of the Constitution, but they are also sustained and enforced by a long series of judicial recognitions and assertions.

In *United States* v. *Fisher*, 2 Cranch, 358, 396, Chief Justice Marshall, in delivering the opinion of the court, said of the clause above relied on: "In construing this clause it would be incorrect, and would produce endless difficulties, if the opinion should be maintained that no law was authorized which was not indispensably necessary to give effect to a specified power. Where various systems might be adopted for that purpose, it might be said with respect to each, that it was not necessary, because the end might be obtained by other means. Congress must possess the choice of means, and must be empowered to use any means which are in fact conducive to the exercise of a power granted by the Constitution."

In *McCulloch* v. *Maryland*, 4 Wheat. 316, 420, 421, Chief Justice Marshall, for the court, delivered one of those opinions which are among the chief ornaments of American jurisprudence. It is largely devoted to an exhaustive analysis of the constitutional clause in question. Among other things, he says: "The result of the most careful and attentive consideration bestowed upon this clause is, that if it does not enlarge, it cannot be construed to restrain the powers of Congress, or to impair the right of the legislature to exercise its best judgment in the selection of measures to carry into execution the constitutional powers of the government. If no other motive for its insertion can be suggested, a sufficient one is found in the desire to remove all doubts respecting the right to legislate on that vast mass of incidental powers which must be involved in the Constitution, if that instrument be not a splendid bauble. We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people."

In *United States* v. *Reese*, 92 U. S. 214, 217, Chief Justice Waite, delivering the opinion of the court, said: "Rights and immunities created by or dependent upon the Constitution of

the United States can be protected by Congress. The form and the manner of the protection may be such as Congress, in the legitimate exercise of its legislative discretion, shall provide. These may be varied to meet the necessities of the particular right to be protected."

In *Strauder* v. *West Virginia*, 100 U. S. 303, 310, the court say : " A right or an immunity, whether created by the Constitution or only guaranteed by it, even without any express delegation of power, may be protected by Congress."

Cooley, in his work on " Constitutional Limitations," collates from the numerous adjudications of this court, cited by him, the following principles : " So far as that instrument [the Constitution] apportions powers to the national judiciary, it must be understood, for the most part, as simply authorizing Congress to pass the necessary legislation for the exercise of those powers by the federal courts, and not as directly, of its own force, vesting them with that authority. The Constitution does not, of its own force, give to national courts jurisdiction of the several cases which it enumerates, but an act of Congress is essential, first, to create courts, and afterwards to apportion the jurisdiction among them. The exceptions are of those few cases of which the Constitution confers jurisdiction upon the Supreme Court by name. And although the courts of the United States administer the common law in many cases, they do not derive authority from the common law to take cognizance of and punish offences against the government. Offences against the nation are defined and their punishment prescribed by acts of Congress." In a note to this paragraph he says : " Demurrer to an indictment for a libel upon the President and Congress. By the court : ' The only question which this case presents is, whether the Circuit Courts can exercise a common law jurisdiction in criminal cases. . . . The general acquiescence of legal men shows the prevalence of opinion in favor of the negative of the proposition. The course of reasoning which leads to this conclusion is simple, obvious, and admits of but little illustration. The powers of the general government are made up of concessions from the several States ; whatever is not expressly given to

the former the latter expressly reserve. . . . It is not necessary to inquire whether the general government, in any and what extent, possesses the power of conferring on its courts a jurisdiction in cases similar to the present; it is enough that such jurisdiction has not been conferred by any legislative act, if it does not result to those courts as a consequence of their creation.' *United States* v. *Hudson,* 7. Cranch, 32; see *United States* v. *Coolidge,* 1 Wheat. 415. 'It is clear there can be no common law of the United States. The federal government is composed of twenty-four sovereign and independent States, each of which may have its local usages, customs and common law. There is no principle which pervades the Union, and has the authority of law, that is not embodied in the Constitution or laws of the Union. The common law could be made a part of our federal system only by legislative adoption.' Per McLean, J., *Wheaton* v. *Peters,* 8 Pet. 591. 658;" and citing many other authorities.

In *Tennessee* v. *Davis,* 100 U. S. 257, 267, referring to the judiciary act of 1789, the court said: "It [the Constitution] did not attempt to confer upon the federal courts all the judicial power vested in the government. Additional grants have from time to time been made. Congress has authorized more and more fully, as occasion has required," etc.

It would seem plain, therefore, that if the Constitution means anything, and if these judicial utterances, extending as they do over a period of eighty years, and embracing a variety of interests, mean anything, they mean that the power to provide and prescribe the laws necessary to effectuate the governmental and official powers of the United States and its officers is vested in Congress.

The gravamen of this case is in the assertion that Neagle slew Terry in pursuance *of a law* of the United States. He who claims to have committed a homicide by authority must show the authority. If he claims the authority of law, then *what* law? And if a law, how came it to be a law? Somehow and somewhere it must have had an origin. Is it a law because of the existence of a special and private authority issued from one of the executive departments? So in almost these words

it is claimed in this case. Is it a law because of some constitutional investiture of sovereignty in the persons of judges who carry that sovereignty with them wherever they may go? Because of some power inherent in the judiciary to create for others a rule or law of conduct outside of legislation, which shall extend to the death penalty? So, also, in this case, *in totidem verbis*, it is claimed. We dissent from both these claims. There can be no such law from either of those sources. The right claimed must be traced to legislation of Congress; else it cannot exist.

If it be said that Congress has the power to make such laws, yet in the absence of statutes from that source other departments may act in the premises; or if it be said that the possession of that power by the government does not negative the existence of similar powers in other departments of the government; the response that these powers are plainly not concurrent, but are exclusive, can be made in the language of Mr. Justice Story, in *Prigg* v. *Pennsylvania*, 16 Pet. 539, 617. Speaking of the fugitive slave law of 1793, he says: "If Congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner, and in a certain form, . . . in such a case the legislation of Congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be any farther legislation to act upon the subject matter. Its silence as to what it does not do is as expressive of what its intention is, as the direct provisions made by it."

If it be said that that case had reference to the interference of a State with congressional powers, whilst in the case at bar no such question is involved, the answer is that the difference is favorable and not adverse to the theory of this opinion. The principle is the same; and if that principle can be applied, as applied it was, to the denial to a state legislature of the powers previously enjoyed over matters originally appertaining to it, *a multo fortiori* will it apply to the exclusion of two coördinate departments of the same government from powers which they never possessed.

As before stated, if the killing of Terry was done "in pursu-

ance of a law of the United States," that law had somewhere an origin. There are under the general government only two possible sources of law. The common law never existed in our federal system. The legislative power possessed by the United States must be found, either exercised in the Constitution as fundamental law, or by some body or person to whom it was delegated by the Constitution. It has already been pointed out that the Constitution does not itself create any such law as that contended for; and that it could not have been created by any executive or judicial action or status is made manifest, not only by the clause in sec. 8, Art. I, already cited and commented on, but also by sec. 1, Art. I, and the two paragraphs of Art. VI.

Sec. 1, Art. I, provides that " *All* legislative power herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." The second paragraph of Art. VI provides that "the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land." Now, what is it that constitutes the supreme laws, of which so much is said in this case? How distinctly, how plainly and how fully the Constitution answers! The Constitution itself, the treaties, and the laws made in pursuance of the Constitution. Made by whom? By Congress, manifestly. The two clauses already quoted give the power of legislation in the most sweeping terms. It alone has power to make any law. Anything purporting to be a law not enacted by Congress would not be " in pursuance of" any provision of the Constitution.

Thus we are driven to look for the source of this asserted law to some legislation of Congress — legislation made under either its express constitutional authority, or under its properly implied authority, it is immaterial which; and there is none of either class.

The authority is sought to be traced here through the self-preservative power of the federal judiciary implied from the Constitution; and then through the obligation of the execu-

tive to protect the judges, implied from the Constitution, whereas there is no such implication in either case, for the simple but all-sufficient reason that by the Constitution itself the whole of those functions is committed to Congress.

Since then the Constitution did not, by its own direct provisions, regulate this matter, but committed it to the hands of Congress with full powers in the premises; it is only by the enactment of some law of Congress that the appellee can show that he is in custody "in violation of the Constitution." As previously remarked, the two propositions are, as to this case, essentially one. Turning again to the statute under which the writ is sued out, we find that the clause relied on is that which makes the writ applicable where the person "is in custody for an act done or omitted in pursuance of a law of the United States." The question then arises, What sort of law? What does the expression import? Is it not plain that it means just what the same expression all through the Constitution imports?

If that instrument, which is the fountain of the federal power, be consulted, it will be found that in it and the amendments thereto the word law, in either its singular form or its plural, laws, is used forty-two times. Of these instances of that use sixteen are where the word is used in reference to the jurisprudence of the States, and of the law of nations, or where they are merely terms of description — such as "courts of law," "cases in law and equity," etc. Of the other instances of its use, and which all have reference to that body of rules which constitute the jurisprudence distinctly of the United States, there are only three cases in which it is not manifest that the word is used as equivalent to "statutes," "enactments of the Congress;" and it is clear in those three instances the word is used also as equivalent to "statutes." The following are examples:

"The Congress may, at any time, *by law*, make or alter such regulations, [in regard to the election of Senators and Representatives]." Art. I, sec. 4.

"Every bill . . . shall, before it become *a law*, be presented," etc. Art. I, sec. 7.

"Congress shall have power . . . to establish . . . uniform *laws* on the subject of bankruptcies," etc. Art. I, sec. 8.

"Congress shall have power . . . to make *all laws* which shall be necessary and proper," etc. Art. I, sec. 8.

"No bill of attainder or *ex post facto law* shall be passed." Art. I, sec. 9.

"Congress shall make no *law* respecting an establishment of religion." 1st Amendment.

It would be tedious, and it is unnecessary, to set them all forth. They all have the same *manifest* meaning of "statutes," except three, and in those three instances the words do not mean anything other than statutes. We think it plain that the expression, "a law of the United States," as used in section 753 of the Revised Statutes, mean just what the similar expression means all through the Constitution, — and that is a *statute* of the United States. *Tennessee* v. *Davis*, 100 U. S. 257, 264.

Of the decisions of this court cited as authority to sustain the order discharging the appellee, *Ex parte Siebold*, 100 U. S. 371, and *Tennessee* v. *Davis, supra*, are relied on as having the most direct bearing on the case. We do not consider *Ex parte Siebold* as being adverse to the proposition which we maintain. In that case the existence of express statutes upon which the controversy arose was undisputed. The sole question was as to the constitutional competency of Congress to pass certain laws which, in the most express, explicit, and imperative words, required marshals and deputy marshals of the United States to attend places for the election of members of Congress, to keep the peace at the polls, make arrests, and protect the supervising officers in the discharge of their duties at those elections. The court decided that the enactments of Congress in question were constitutional. The power of Congress to pass these laws being thus settled, no assertion as to the powers of the marshals and deputy marshals to execute them in the States can be found in that able opinion which do not follow as a logical consequence. We fail to see anywhere in the decision any intimation that, independently of such legislation,

the officers therein named could, by virtue of their office, have exercised the same powers in obedience to the instructions of an executive department, in the exercise of its authority implied from the Constitution.

· In *Tennessee* v. *Davis*, the case was removed from a state court to the Circuit Court of the United States, under the express provisions of section 643 of the Revised Statutes. The homicide, for which the petitioner was prosecuted, was committed by him while executing his duties, as a revenue officer, in pursuance of the express requirements of the revenue laws, and in defence of his own life, upon a party offering unlawful resistance. So far from running counter to the position we are seeking to maintain, we think the principle ·there laid down, on the point we are now discussing, is in accord with that position. The language of the court, through Mr. Justice Strong, who delivered its opinion, is as follows: " Cases arising under the laws of the United States are such as grow out of the legislation of ·Congress, whether they constitute the right, or privilege, or claim or protection, or defence of the party, in whole or in part, by whom they are asserted. Story on the Constitution, sec. 1647; 6 Wheat. 379."

Whilst it is true that the opinions in both of those cases assert in the strongest and most impressive language the supremacy of the government of the United States in the exercise of the powers conferred upon it by the Constitution, we regard them also as a vindication of Congress as the law-making department of the government, as the depository of the implied and constructed powers of the government; or, as Mr. Chief Justice Marshall expresses it, of the power to legislate upon that vast mass of incidental powers which must be involved in the Constitution, if that instrument be not a splendid bauble.

As the *Siebold Case* and *Tennessee* v. *Davis* have been referred to as the most important and directly in point in support of the opposite view, we do not deem it necessary to give an extended examination of the series of cases decided by the Circuit and District Courts cited to the same purport. *Ex parte Jenkins*, 2 Wall. Jr. 521, to which attention is more especially called, combined in itself the main features of most-

of the others, which were proceedings under the fugitive slave law, in which United States marshals were arrested while executing process under that law by state officers acting under the authority of the statutes of the State, the inevitable effect, if not the avowed object, of which was to nullify the operation of the aforesaid act of Congress.

This was so in *Ex parte Jenkins.* The United States marshal was arrested on a warrant issued by a state magistrate while he was executing a warrant issued under said law of Congress. He was brought before the Circuit Court of the United States for the Eastern District of Pennsylvania, on a writ of *habeas corpus,* and was discharged upon the ground that the fugitive slave law, having been enacted in pursuance of the Constitution of the United States, was paramount to the law of Pennsylvania in conflict with it, and that the marshal, being in custody for an act done in pursuance of that law of Congress, and in execution of process under it, was entitled to his discharge. It is so manifest that that case was within the provision of section 753 of the Revised Statutes that further comment is unnecessary; and the same may be said of all of the other decisions of the circuit and district courts. In every one of them the party discharged was in custody either for an act done in pursuance of an express statute of Congress, or in the execution of a decree, order, or process of a court, or the custody was in violation of the Constitution of the United States.

We stated at the outset of these remarks that we raised no question upon the discussion of the history of the legislation of Congress upon the subject of the writ of *habeas corpus.* We think, however, it is pertinent in this connection to inquire what was the necessity for any such legislation at all if the theory contended for as to the sufficiency of the self-executing powers of the executive and judicial departments of the government to protect all the agencies and instrumentalities of the federal government is correct. Why could not President Jackson, in 1833, as the head of the executive department, invested with the power and charged with the duty to take care that the laws be faithfully executed and to defend the Consti-

tution, have enforced the collection of the federal revenues in the port of Charleston, and have protected the revenue officers of the government against any arrest made under the pretensions of state authority, without the aid of the act of 1833? Why, in 1842, when the third *habeas corpus* act was passed, could not the President of the United States, by virtue of the same self-executing powers of the executive, together with those of the judicial department, have enforced the international obligations of the government, without any such act of Congress? It is a noteworthy fact in our history, that whenever the exigencies of the country, from time to time, have required the exercise of executive and judicial power for the enforcement of the supreme authority of the United States government for the protection of its agencies, etc., it was found, in every instance, necessary to invoke the interposition of the power of the national legislature. As early as 1807, in *Ex parte Bollman and Swartwout*, 4 Cranch, 75, 94, Chief Justice Marshall said: "The power to award the writ [of *habeas corpus*] by any of the courts of the United States, must be given by written law. . . . The inquiry, therefore, on this motion will be, whether by any statute compatible with the Constitution of the United States, the power to award a writ of *habeas corpus*, in such case as that of Erick Bollman and Samuel Swartwout, has been given to this court."

It is claimed that such a law is found in section 787 of the Revised Statutes, which is as follows:

"It shall be the duty of the marshal of each district to attend the district and circuit courts when sitting therein, and to execute, throughout the district, all lawful precepts directed to him, and issued under the authority of the United States; and he shall have power to command all necessary assistance in the execution of his duty."

It is contended that the duty imposed upon the marshal of each district by this section is not satisfied by a mere formal attendance upon the judges while on the bench; but that it extends to the whole term of the courts while in session, and can fairly be construed as requiring him to attend the judge while on his way from one court to another, to perform his

duty. It is manifest that the statute will bear no such construction. In the first place, the judge is not the court; the person does not embody the tribunal, nor does the tribunal follow him in his journeys. In the second place, the direction that he shall attend the court confers no authority or power on him of any character; it is merely a requirement that he shall be present, in person, at the court when sitting, in order to receive the lawful commands of the tribunal, and to discharge the duties elsewhere imposed upon him.

Great as the crime of Terry was in his assault upon Mr. Justice Field, so far from its being a crime against the court, it was not even a contempt of court, and could not have received adequate punishment as such. Section 725 of the Revised Statutes limits contempt to cases of misbehavior in the presence of the court, or so near thereto as to obstruct the administration of justice.

It is claimed that the law needed for appellee's case can be found in section 788 of the Revised Statutes. That section is as follows: " The marshals and their deputies shall have, in each State, the same powers, in executing the laws of the United States, as the sheriffs and their deputies in such State may have, by law, in executing the laws thereof."

It is then argued that by the Code of California the sheriff has extensive powers as a conservator of the peace, the statutes to that effect being quoted *in extenso;* that he also has certain additional common law powers and obligations to protect the judges and to personally attend them on their visits to that State; that, therefore, no statutory authority of the United States for the attendance on Mr. Justice Field by Neagle, and for Neagle's personal presence on the scene was necessary; and that that statute constituted Neagle a peace officer to keep the peace of the United States. This line of argument seems to us wholly untenable.

By way of preliminary remark it may be well to say, that so far as the simple fact of Neagle's attendance on Mr. Justice Field, and the fact of his personal presence, are concerned, no authority, statutory or otherwise, was needed. He had a right to be there; and being there, no matter how or why, if it be-

came necessary to discharge an official duty, he would be just as much entitled to the protection of section 753 of the Revised Statutes as if he had been discharging an official duty in going there. The fallacy in the use made of section 788, in the argument just outlined, is this: That section gives to the officers named the same measure of powers when in the discharge of their duties as those possessed by the sheriffs, it is true; but it does not alter the duties themselves. It does not empower them to enlarge the scope of their labors and responsibilities, but only adds to their efficiency within that scope. They are still, by the very terms of the statute itself, limited to the execution of " the laws of the United States;" and are not in any way by adoption, mediate or immediate, from the code or the common law, authorized to execute the laws of California. The statute, therefore, leaves the matter just where it found it. If the act of Terry had resulted in the death of Mr. Justice Field, would the murder of him have been a crime against the United States? Would the government of the United States, with all the supreme powers of which we have heard so much in this discussion, have been competent, in the present condition of its statutes, to prosecute in its own tribunals the murder of its own Supreme Court justice, or even to inquire into the heinous offence through its own tribunals? If yes, then the slaying of Terry by the appellee, in the necessary prevention of such act, was authorized by the law of the United States, and he should be discharged; and that, independently of any official character, the situation being the same in the case of any citizen. But if no, how stands the matter then? The killing of Terry was not by authority of the United States, no matter by whom done; and the only authority relied on for vindication must be that of the State, and the slayer should be remanded to the state courts to be tried. The question then recurs, Would it have been a crime against the United States? There can be but one answer. Murder is not an offence against the United States, except when committed on the high seas or in some port or harbor without the jurisdiction of the State, or in the District of Columbia, or in the Territories, or at other places where the

Dissenting Opinion: Lamar, J., Fuller, C. J.

national government has exclusive jurisdiction. It is well settled that such crime must be defined by statute, and no such statute has yet been pointed out. The United States government, being thus powerless to try and punish a man charged with murder, we are not prepared to affirm that it is omnipotent to discharge from trial and give immunity from any liability to trial where he is accused of murder, unless an express statute of Congress is produced permitting such discharge.

We are not unmindful of the fact that in the foregoing remarks we have not discussed the bearings of this decision upon the autonomy of the States, in divesting them of what was once regarded as their exclusive jurisdiction over crimes committed within their own territory, against their own laws, and in enabling a federal judge or court, by an order in a *habeas corpus* proceeding, to deprive a State of its power to maintain its own public order, or to protect the security of society and the lives of its own citizens, whenever the amenability to its courts of a federal officer or employé or agent is sought to be enforced. We have not entered upon that question, because, as arising here, its suggestion is sufficient, and its consideration might involve the extent to which legislation in that direction may constitutionally go, which could only be properly determined when directly presented, by the record in a case before the court of adjudication.

For these reasons, as briefly stated as possible, we think the judgment of the court below should be reversed and the prisoner remanded to the custody of the sheriff of San Joaquin County, California; and we are the less reluctant to express this conclusion, because we cannot permit ourselves to doubt that the authorities of the State of California are competent and willing to do justice; and that even if the appellee had been indicted, and had gone to trial upon this record, God and his country would have given him a good deliverance.

Mr. Justice Field did not sit at the hearing of this case, and took no part in its decision.